*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

THOMAS JUDGE,

        *Plaintiff-Appellant,*

      *v.*

METROPOLITAN LIFE INSURANCE COMPANY,

        *Defendant-Appellee.*

No. 12-1092

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:11-cv-12581—Paul D. Borman, District Judge.

Argued: December 5, 2012

Decided and Filed:  March 25, 2013

Before:  MOORE, GILMAN, and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Gary S. Fields, EISENBERG, BENSON & FIELDS, PLLC, Southfield, Michigan, for Appellant.  David M. Davis, HARDY, LEWIS & PAGE, P.C., Birmingham, Michigan, for Appellee.  **ON BRIEF:** Gary S. Fields, EISENBERG, BENSON & FIELDS, PLLC, Southfield, Michigan, for Appellant.  David M. Davis, HARDY, LEWIS & PAGE, P.C., Birmingham, Michigan, for Appellee.

      GILMAN, J., delivered the opinion of the court, in which KETHLEDGE, J., joined, and MOORE, J., joined in part.  MOORE, J. (pp 19–24), delivered a separate opinion dissenting in part.

_____

**OPINION**

_____

      RONALD LEE GILMAN, Circuit Judge.  Thomas Judge, who underwent surgery to repair an aortic valve and a dilated ascending aorta, applied for disability benefits under a group insurance policy (the Plan) issued by Metropolitan Life Insurance

1

Company (MetLife). MetLife denied benefits, however, when it determined that Judge was not totally and permanently disabled under the terms of the Plan. After exhausting MetLife's internal administrative procedures, Judge brought this action to recover benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), a provision of the Employee Retirement Income Security Act (ERISA). The district court granted judgment on the administrative record in favor of MetLife.

Judge argues on appeal that MetLife's denial of benefits was arbitrary and capricious. Specifically, he contends that (1) MetLife applied the wrong definition of "total disability" to Judge's claim, (2) MetLife erred in failing to obtain vocational evidence before concluding that Judge was not totally and permanently disabled, (3) MetLife erred in conducting a file review by a nurse in lieu of having Judge undergo an independent medical examination, and (4) there was a conflict of interest because MetLife both evaluates claims and pays benefits under the Plan. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

Judge, who has a high-school education, worked as an airline baggage handler and ramp agent for 20 years. As an employee of Delta Airlines, he was covered by Delta's term life insurance policy. The insurance policy provides for the early payment of benefits of up to $100,000 if an employee becomes totally and permanently disabled. MetLife is both the Plan's administrator and the payor of benefits. The Plan defines total and permanent disability as follows:

> Total and Permanent Disability or Totally and Permanently Disabled means, for purposes of this section, that because of a sickness or an injury . . . :
>
> You are expected never again to be able to do:
>
> Your job; and
>
> Any other job for which You are fit by education, training or experience.

In order to claim benefits under the Plan, Judge was required to send MetLife proof that he was totally and permanently disabled and that such total and permanent disability has continued without interruption. The Plan defines "proof" as follows:

> Proof means written evidence satisfactory to Us that a person has satisfied the conditions and requirements for any benefit described in this certificate. When any claim is made for any benefit described in this certificate, Proof must establish: the nature and extent of the loss or condition; Our obligation to pay the claim; and the claimant's right to receive payment.

After his brother was diagnosed with an ascending aortic aneurysm, Judge saw his own physician and learned that he had a similar problem with a dilated ascending aorta. Cardiac surgeon C. Michael Deeb recommended surgery to replace the ascending aorta and remove a mass on Judge's aortic valve. Judge underwent surgery in March 2010 and has not returned to work with Delta since. He was 47 years old at the time of the surgery. In November of 2010, Judge filed a claim with MetLife for a lump-sum disability benefit.

Judge submitted several post-surgery reports from his physicians in support of his claim. These physicians included Dr. Deeb, Dr. Himanshu J. Patel (who worked with Dr. Deeb), and Dr. Daniel Harber, another of Judge's treating physicians. MetLife considered each of these reports in evaluating Judge's claim.

Dr. Deeb examined Judge in April 2010. In a letter addressed to Dr. Harber and Dr. Corinne Adler (still another of Judge's treating physicians), Dr. Deeb noted that Judge was "actually doing well." Judge was "awake, alert, oriented, and neurologically intact." In addition, Judge was "up and about, freely mobile." Dr. Deeb advised that Judge could "increase his activity," but limited him to lifting no more than 15 pounds. These assessments were supported in extensive medical detail.

Judge saw Dr. Patel in July 2010. Dr. Patel noted in a letter to Drs. Harber and Adler that Judge was "alert and oriented and in no acute distress." He also wrote that a CT scan of Judge's chest and abdomen showed "an intact repair of his ascending aorta with no evidence of complication." Because Judge had "an intact aortic repair with a

repaired bicuspid aortic valve," Dr. Patel advised that Judge could "gradually increase his lifting, pushing, and pulling to [a] maximum of 50 pounds" and could "participate in mild-to-moderate intensity level aerobic activities." Dr. Patel cautioned that Judge required "an additional six weeks' time off work to complete his physical therapy." These assessments, too, were accompanied by an extensive discussion of Judge's medical condition.

In October 2010, Dr. Deeb completed an "Attending Physician Statement." Dr. Deeb filled in boxes on the form that, without explanation, restricted Judge to two hours of intermittent sitting and zero hours of standing or walking per day. Another box was checked that restricted Judge from reaching above shoulder level, climbing, twisting, bending, or stooping. He was, however, permitted to operate a motor vehicle. In response to the question: "In your opinion, why is patient unable to perform job duties?", Dr. Deeb wrote: "Lifting restriction 30 to 35 lbs." But the report also stated that Judge could work eight hours per day and that only his lifting restriction was unlikely to improve. With respect to Judge's cardiac capacity, Dr. Deeb checked the box for "Class 2 (Slight Limitation)." Judge concedes that Dr. Deeb "noted that Mr. Judge was totally disabled for [only] an indefinite period of time." There is no further medical explanation contained in or attached to Dr. Deeb's statement.

In December 2010, Dr. Harber completed his own Attending Physician Statement. Dr. Harber also filled in boxes that restricted Judge to two hours of intermittent sitting and zero hours of standing or walking per day. He similarly stated that Judge could not reach above shoulder level, climb, twist, bend, or stoop, but that he could operate a motor vehicle. Dr. Harber indicated that Judge was unable to perform his job duties because he was not to lift anything over 30 pounds. But he stated that Judge could work eight hours per day and that "[a]ll areas should improve besides [sic] lifting restrictions." Dr. Harber also classified Judge's cardiac capacity as "Class 2 (Slight Limitation)." In response to the question: "Have you advised patient to return to work?" Dr. Harber checked the box for "No," and in response to the next prompt: "Any work/activity restrictions applicable," he wrote that he was "basing this on Dr.

Deeb's recommendation." There is no further medical explanation contained in or attached to Dr. Harber's statement.

A nurse consultant at MetLife, Janice Kinsinger, reviewed the medical reports provided by Judge's physicians. In her evaluation, she noted the inconsistencies between the first two reports (Dr. Deeb's April 2010 letter and Dr. Patel's July 2010 letter) and the last two reports (Dr. Deeb's October 2010 statement and Dr. Harber's December 2010 statement). She found no medical evidence supporting the restrictions on Judge's ability to sit, stand, and walk.

In January 2011, MetLife denied Judge's claim. MetLife summarized the reports and concluded that (1) Dr. Patel's letter indicated that Judge "had the capacity to perform at least light duty activities"; (2) Dr. Deeb's October 2010 statement "did not provide objective medical documentation" as to why Judge was unable to stand or walk and, "[e]xcluding the severe limits to standing and walking," it appeared that Judge was able to perform light work; and (3) Dr. Harber's statement did not indicate that Judge's symptoms "continued to be so severe several months after [his] surgery or that [he was] confined to bed as a result of . . . not being able to perform walking or standing activities."

The denial letter from MetLife concluded that Judge had submitted insufficient information to support a finding of disability under the terms of the Plan, which the letter misstated as requiring that Judge be "expected never again to be able to do any work at all for wage or profit." Judge was advised in the letter that he could appeal the denial within 180 days and submit additional documentation in support of his appeal. In response, Judge's attorney stated that Judge had no updated medical documentation and that he relied upon the statements from his treating physicians submitted to date.

A nurse, Diane Englert, reviewed Judge's documents as part of MetLife's administrative- appeal procedure. Englert considered the previously submitted reports and noted that no additional medical information had been provided. She concurred with the prior nurse's conclusion that Judge was recovering as expected from surgery, that

there was no evidence of post-operative complications, and that improvement was expected in all areas except the lifting restriction.

MetLife upheld its denial of benefits to Judge in a letter dated April 6, 2011. In this letter, MetLife quoted the correct definition of total and permanent disability and determined that Judge was not disabled as defined by the Plan. MetLife wrote:

> Your employer's plan states the following:
>
> Total and Permanent Disability or Totally and Permanently Disabled means, for purpose[s] of this section, that because of a sickness or an injury . . . : You are expected never again to be able to do: Your job; and any other job for which You are fit by education, training or experience . . . .
>
>  . . . .
>
> . . . When you were seen by Dr. Patel on July 7, 2010, Dr. Patel [] documented you were recovering as expected and recommended that you complete your physical therapy, that you could do mild to moderate intensity aerobic activity, and were allowed to gradually increase your lifting, pushing and pulling to the maximum of 50 pounds. This information does not indicate you have any limitations with sitting, standing, walking, using your arms or hands or are unable to work in any capacity. Dr. Patel also advised on July 7, 2010 that you would need an additional six weeks off work to complete your physical therapy. Based on this information from Dr. Patel in July, it appeared at that time you were not ready to return to your former job which required you to lift heavy luggage, however you had the capacity to perform at least light duty activities. The echocardiogram done on June 30, 2010 showed improvement after your surgery and that you had only mild aortic stenosis and a trace amount of aortic regurgitation, and normal ventricular function as the ejection fraction was 60-65%, improved from 55% pre-operatively.
>
> Dr. Deeb completed an Attending Physician Statement October 15, 2010 indicating that your lifting was restricted to 30-35 pounds and that you could work eight hours a day. It is unclear as to why Dr. Deeb advised you could do no standing or walking at all, and only sit for two hours. There is no medical information on or about October 2010 which indicates that you developed other medical condition(s), had a relapse, complications or other event that decreased your functional abilities as per Dr. Patel's assessment as of July 7, 2010. The most recent information we have is an Attending Physician Statement dated December 23, 2010 from Dr. Harber, who also advised you could not

stand or walk, but also noted improvement in all functional areas was expected, except for the limit of lifting above 35 lbs. There is no objective clinical data to explain or support what occurred beyond July 7, 2010 to result in a functional status of essentially being bedridden to wheelchair bound, with no standing or walking ability. The standing and walking function listed is inconsistent with the advised lifting and pushing and pulling capabilities, and also inconsistent with Dr. Harber's documentation you could work eight hours a day. In addition, Dr. Harber's notation in December 2010 that improvement in function was expected in all areas other than lifting is consistent with Dr. Patel's assessment in July 2010, and does not support that you were not continuing to regain additional function for performing work activities, and therefore does not meet the plan provision for being permanently disabled.

## II.  ANALYSIS

### A.      Standard of review

"[A] denial of benefits challenged under § 1132(a)(1)(B) [a part of ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). "When such authority is granted, the highly deferential arbitrary and capricious standard of review is appropriate." *Borda v. Hardy, Lewis, Pollard, & Page, P.C.*, 138 F.3d 1062, 1066 (6th Cir. 1998) (internal quotation marks omitted). The district court in the present case applied the arbitrary-or-capricious standard of review, and Judge concedes that this is the applicable standard.

A plan administrator's decision will not be deemed arbitrary or capricious so long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Davis v. Ky. Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (noting that "[t]he arbitrary or capricious standard is the least demanding form of judicial review of administrative action") (internal quotation marks omitted). We will uphold a benefits determination if it is "rational in light of the plan's provisions." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). Our review of the decision of a plan administrator is limited to the administrative record; that is, we "are required to

consider only the facts known to the plan administrator" at the time of the decision. *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

In his brief on appeal, Judge refers to a "Hartford policy" and states that his claim for long-term disability benefits under that policy was approved. He also refers to a ruling of the Social Security Administration that discusses light and sedentary work. This latter ruling does not appear to be a ruling on any claim by Judge for such benefits, although Judge's counsel informed the court at oral argument that Judge has in fact been granted Social Security disability benefits. Nevertheless, because neither the Hartford policy nor any Social Security ruling is in the administrative record, we will not consider them for purposes of this appeal. *See Yeager*, 88 F.3d at 381.

**B.    MetLife's recital of the incorrect standard of " total disability" in its initial denial letter was later corrected**

Judge contends that MetLife applied an incorrect definition of total and permanent disability when it denied his claim. He argues that MetLife's initial denial was based on the incorrect standard that Judge was expected never again to be able to do any work "at all for wage or profit," and not on the proper standard that he was expected never again to be able to do any work "for which he was fit by education, training, or experience." MetLife responds by pointing out that it used the correct definition of total disability in its final denial letter. The district court acknowledged that the initial denial letter contained an incorrect definition of disability, but concluded that because the final denial letter stated the correct definition, MetLife did not apply an incorrect definition during the administrative-appeal phase of Judge's claim. *Judge*, 2011 WL 6740748, at *3.

The district court reached the right result. We are aware that MetLife's second denial letter, despite initially quoting the correct definition of disability as set forth in the Plan, later refers to Judge's ability or inability to do "all work activities," "work in any capacity," or do "any work activities." Rather than evidencing that MetLife actually applied the wrong standard in evaluating Judge's claim, however, these recitals simply demonstrate MetLife's use of shorthand jargon. Indeed, immediately following nearly

every incomplete statement of the standard detailed above, MetLife reminds Judge that he must show that he is disabled "as defined by the [P]lan."

The second denial letter in fact incorporates the correct definition of disability as set forth in the Plan, which states that total and permanent disability is the inability to do any job for which a claimant is fit by education, training, or experience. Although MetLife could have repeated the full definition of total and permanent disability throughout its second denial letter, its shorthand way of referencing the standard does not make its review arbitrary or capricious. *Cf. Cook v. Prudential Ins. Co. of Am.*, No. 11-3364, 2012 WL 3538520, at *8 (6th Cir. Aug. 16, 2012) ("To be sure, Prudential's decision letter is hardly a model of clarity, and at many points, its stated reasons for denying Cook's claims are unduly perfunctory. Even so, we simply cannot conclude from the evidence before us that the record compels—or even strongly supports—a different result.").

Nor can we conclude, looking at the letter as a whole, that MetLife either misunderstood or misapplied the proper standard as defined by the Plan. MetLife explicitly reasoned that, based on Dr. Patel's July 2010 letter, Judge "was not ready to return to [his] former job which required [him] to lift heavy luggage," but that the medical evidence supported the fact that he "had the capacity to perform at least light duty activities." It further noted that there was no medical evidence beyond this date that showed a decline in functional status to the point of "essentially being bedridden to wheelchair bound, with no standing or walking ability." These explanations are drawn from MetLife's internal review, which concluded that Judge could do "moderate aerobic activity," that he could "gradually increas[e]" his lifting, pushing, and pulling as of July 2010, and that there was no evidence of limitations on his ability to sit, stand, or walk since that time.

In light of these assessments, we respectfully disagree with our dissenting colleague's critique that MetLife made a "painfully obvious" mistake by erroneously applying an "all work activities" standard. MetLife did not improperly consider, for example, whether Judge could do some job for which he was clearly not fit. *Cf. Kalish*

*v. Liberty Mut./Liberty Life Assurance Co.*, 419 F.3d 501, 506-07 (6th Cir. 2005) (noting that the claimant's capability of performing sedentary work did not preclude a finding of disability because his former occupation required him to walk, stand, and reach, and the plan provision required that a claimant be unable to perform all material and substantial duties of his or her occupation).  Rather, MetLife's discussion of Judge's abilities takes into consideration his prior experience (the manual labor of lifting heavy luggage) and his continuing ability to do less-strenuous lifting activities, as well as his ability to sit, stand, and walk.

Furthermore, MetLife's reason for denying Judge's claim—the lack of medical evidence supporting the conclusion that Judge could not sit, stand, or walk—was consistent throughout the administrative-review process, and the initial letter's recitation of the wrong standard is merely a harmless error that was rectified upon review.  *Cf. Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 805, 807-08 (6th Cir. 1996) (finding that the plan administrator substantially complied with the notice requirements of ERISA despite the fact that only the second of two denial letters cited the relevant plan language relating to disability); *see also Cameron v. Am. Elec. Power Serv. Corp.*, 240 F. App'x 297, 303-04 (10th Cir. 2007) (holding that an erroneous reference to a different plan in the first denial letter did not require reversal of the district court's judgment for the plan administrator because the second letter upholding the denial corrected the error, and it was this final determination that the court reviewed); *Earl v. Life Ins. Co. of N. Am.*, 204 F. App'x 592, 593-94 (9th Cir. 2006) (upholding the denial of benefits, even though the plan administrator quoted the incorrect definition of disability in letters sent to the claimant, because the evidence indicated that the incorrect definition was quoted by mistake, the claimant had previously received the correct definition of disability, and the plan administrator adhered to a consistent explanation in denying benefits).

Finally, as a practical matter, even if MetLife were found to have applied an incorrect definition of total and permanent disability, a remand to MetLife for reconsideration under the correct definition would be unavailing.  As discussed below in Part II.C., the objective medical evidence shows that Judge is not disabled in the sense

that he could never again perform any job for which he is fit by education, training, or experience. *Cf. Kent*, 96 F.3d at 807 (holding that the alleged defects in the claim procedures did not warrant reversal of the district court's decision because, among other things, remand would represent a "useless formality" when much of the objective medical evidence supported the conclusion that the claimant was not disabled); *Beaty v. United States*, 937 F.2d 288, 291 (6th Cir. 1991) ("Here, the record is complete, and it would be a waste of everyone's time to remand to the district court what can be decided now as a matter of law."). We thus find no jurisprudential purpose in remanding to MetLife for reconsideration when it would undoubtedly reach the same conclusion based on the administrative record before it.

**C.    The administrative record lacks objective medical evidence that Judge is totally and permanently disabled**

Judge contends that he is totally and permanently disabled under the language of the Plan. MetLife responds by arguing that Judge has not met his burden of producing satisfactory proof of disability. Judge's claim was properly denied, according to MetLife, because the administrative record contains substantial evidence that he is not totally and permanently disabled from performing any job for which he is fit by education, training, or experience. Judge contends that MetLife failed to take into account the fact that he has experience only in heavy lifting and that he could not perform similar work. But the definition of "total and permanent disability" does not require that benefits be paid simply because Judge is unable to perform work similar to the work he performed before his surgery. Judge must instead show that he could never again do *any* work for which he is fit by education, training, or experience.

"[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious. For this, we must examine Met Life's decision in light of the administrative record." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). In the present case, in light of the consistent assessments by Judge's physicians that his lifting restrictions were unlikely

to improve, one can reasonably conclude that Judge will never again be able to lift heavy objects such as luggage. But all other assessments in the record point to improvement in Judge's functional capacity. Indeed, all of his doctors either anticipated that he would return to work or stated that he could work for eight hours per day. They expected improvement in all areas except lifting. Even Judge concedes that Dr. Deeb did not find him permanently precluded from returning to work.

No objective medical evidence supports Judge's argument that he is permanently unable to sit, stand, or walk so as to prevent him from doing some other job for which he is fit by education, training, or experience. "Requiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 166 (6th Cir. 2007). The only such evidence in the present case is found in the boxes that Dr. Deeb and Dr. Harber checked that restrict sitting, standing, and walking in their respective October and December 2010 Attending Physician Statements. But neither Dr. Deeb nor Dr. Harber explains what objective medical evidence supports these restrictions. In addition, the assessment that Judge is able to sit for only two hours at a time and not stand or walk at all is inconsistent with the other findings contained within these same statements. Both Dr. Deeb and Dr. Harber noted, after all, that Judge could work eight hours per day and characterized Judge's cardiac capacity as "Class 2 (Slight Impairment)."

MetLife's initial denial letter concluded that the record lacked "objective medical documentation" explaining why he could not stand or walk. Judge was therefore on notice as to the information that he was required to produce in order for his claim to be approved on administrative appeal. He nevertheless chose not to ask Dr. Deeb or Dr. Harber to explain their check marks or to submit updated medical evidence, despite the Plan placing the burden on Judge to establish his disability rather than on MetLife to show to the contrary. *Cf. Likas v. Life Ins. Co. of N. Am.*, 347 F. App'x 162, 167 (6th Cir. 2009) ("Plaintiff must provide 'continued proof' of his disability under the policy; LINA does not bear the burden of showing that plaintiff's eligibility has ended."). Accordingly, MetLife made the final determination that the record lacked objective medical evidence

to support a finding of disability: "There is no medical information on or about October 2010 which indicates that you developed other medical condition(s), had a relapse, complications or other event that decreased your functional abilities as per Dr. Patel's assessment as of July 7, 2010." Instead, MetLife determined that Judge was not "permanently unable to return to work as defined by the plan." This conclusion is supported by substantial evidence, including the notes prepared by Dr. Deeb in April 2010 stating that Judge could increase his activity, Dr. Patel's assessment that Judge could do mild-to-moderate intensity-level aerobic activities, and Dr. Deeb's and Dr. Harber's statements that Judge could work eight hours per day.

We further note that the Attending Physician Statements provided space for Dr. Deeb and Dr. Harber to give narrative responses to the following questions: "In your opinion, why is patient unable to perform job duties?", "Do you expect improvement in any area?", and "Any work/activity restrictions applicable (please be specific) [?]" Because Dr. Deeb and Dr. Harber failed to provide any reasoning to support their inconsistent assessments of Judge's functionality on forms that explicitly invited an explanation, and because the record is likewise devoid of detailed clinical or diagnostic evidence supporting their determinations that Judge could not stand or walk, MetLife's conclusion that no objective evidence supported Dr. Deeb and Dr. Harber's check-offs was neither arbitrary nor capricious.

**D.    MetLife was not required to obtain vocational evidence before making its determination**

Judge also contends that MetLife should have provided a job analysis by consulting a vocational expert about his employability in light of his limitations. As stated above, there is objective evidence supporting Judge's permanent inability to perform his prior occupation of baggage handler, but there is no objective evidence supporting further limitations on sitting, standing, or walking. The issue is therefore whether MetLife was required to consult a vocational expert to provide evidence of other jobs for which Judge is qualified in light of his education, training, and experience that do not involve heavy lifting.

Based upon the applicable caselaw, MetLife was not required to do so. *See Douglas v. Gen. Dynamics Long Term Disability Plan*, 43 F. App'x 864, 870 (6th Cir. 2002) (holding that the plan administrator was not required to offer testimony from a vocational expert as to the types of jobs plaintiff could perform given his disabilities before the plan administrator could deny his claim for long-term disability benefits); *see also Burge v. Republic Engineered Prods., Inc.*, 432 F. App'x 539, 550 (6th Cir. 2011) ("Republic was also not required to consider vocational evidence, as opposed to medical evidence, in analyzing Burge's claim." (citing *Douglas*, 43 F. App'x at 870)).

A number of our sister circuits have reached the same conclusion. *See Piepenhagen v. Old Dominion Freight Line, Inc.*, 395 F. App'x 950, 957 (4th Cir. 2010) ("Under this court's precedents, a plan is not required as a matter of law to obtain vocational or occupational expertise in its evaluation of an employee's claim."); *Holland v. Int'l Paper Co. Ret. Plan*, 576 F.3d 240, 251 (5th Cir. 2009) ("Ample record evidence supported the Plan Administrator's denial of benefits without the necessity of obtaining a vocational rehabilitation expert."); *Conley v. Pitney Bowes*, 176 F.3d 1044, 1050 (8th Cir. 1999) (noting that vocational expert testimony "is the special creature of social security, and has no relevance to Mr. Conley's case" (internal citations omitted)); *McKenzie v. Gen. Tel. Co. of Cal.*, 41 F.3d 1310, 1316 (9th Cir. 1994), *abrogated on other grounds by Saffron v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008) (affirming the grant of summary judgment for the insurer because the decision that the insured was not disabled and could perform other occupations was supported by substantial evidence even absent vocational evidence); *Block v. Pitney Bowes Inc.*, 952 F.2d 1450, 1455 (D.C. Cir. 1992) (Ginsburg, J.) (concluding that no provision in the plan required the plan administrator to furnish vocational evidence of the jobs for which plaintiff was fit by education, experience, capability, or training).

This court's decision in *Douglas*, 43 F. App'x 864, is particularly instructive on this issue. Douglas claimed that he was totally disabled due to his depression, and his treating physician submitted a report to that effect. *Id.* at 865–66. Two independent

medical examiners concluded, however, that Douglas was not disabled within the meaning of the relevant plan, which provided long-term disability benefits if participants could not work "at any job for which [they are], or could reasonably become, fitted by education, training or experience." *Id.* at 866 & n.2 (alteration in original).  Based on these examinations, the plan administrator concluded that Douglas was not totally disabled. *Id.* at 866.  The district court held that the plan administrator's decision was not arbitrary or capricious. *Id.* at 866–87.

On appeal, Douglas argued, among other things, that vocational evidence as to what type of jobs he could perform was required before the plan administrator could deny him benefits. *Id.* at 867.  This court disagreed, holding that offering vocational evidence was relevant in the Social Security context but not for the purposes of ERISA. *Id.* at 870.  The court specifically noted that the plan administrator had sufficient information in the record—namely, the reports of the two medical examiners—from which to conclude that Douglas was not totally disabled. *Id.* at 869.  Finally, the court pointed out that Douglas had presented "no evidence that he was prevented, either on his administrative appeal or before the district court, from presenting the testimony of a vocational expert." *Id.* at 870.  The court therefore affirmed the judgment of the district court. *Id.* at 872.

We conclude, in light of the above caselaw, that a plan administrator is not required to obtain vocational evidence where the medical evidence contained in the record provides substantial support for a finding that the claimant is not totally and permanently disabled.  Applying this principle to the present case, we hold that MetLife was not required to obtain vocational evidence to support its denial of Judge's claim for total and permanent disability.  Although Judge is unlikely to ever again be able to perform the kind of heavy lifting that he performed as a baggage handler, this inability to lift heavy items is not such a broad impairment as to preclude Judge from engaging in other suitable occupations.  We therefore find no basis to conclude that MetLife's determination as to Judge's future employability was arbitrary or capricious.

**E.     MetLife was not required to send Judge for an independent medical examination**

Judge's next argument is that MetLife acted arbitrarily and capriciously when it failed to send him for an independent medical examination or have a cardiologist review his records.   He also contends that it was improper for only a nurse to review his records.

This court has previously noted that "the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination," but "reliance on a file review does not, standing alone, require the conclusion that [a plan administrator] acted improperly." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005).  A plan administrator's decision to conduct a file-only review might raise questions about the benefits determination, particularly where the right to conduct a physical examination is specifically reserved in the plan. *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006).  In the present case, the Plan reserved the right to conduct a physical exam.  The question, therefore, is whether the file review conducted in the present case is of the kind to which this court has taken exception.

We conclude that it is not.  This court has found fault with file-only reviews in situations where the file reviewer concludes that the claimant is not credible without having actually examined him or her. *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 555 (6th Cir. 2008).  In addition, this court has discounted a file review when the plan administrator, without any reasoning, credits the file reviewer's opinion over that of a treating physician. *Elliot*, 473 F.3d at 620.

The present case, however, is distinguishable from the above circumstances. Here, the file reviewers made no credibility determinations about Judge and did not second-guess Judge's treating physicians.  The nurses' findings simply echo those of Judge's own doctors, make note where the reports lack objective medical evidence in support of the boxes checked, and point out the internal inconsistencies.

Furthermore, Judge's argument that MetLife acted arbitrarily and capriciously in referring his file to a nurse for review, rather than to a physician, is meritless. This court has previously upheld the decision of a plan administrator where a nurse reviewed the medical evidence, *see Boone v. Liberty Life Ins. Assurance Co. of Boston*, 161 F. App'x 469, 474 (6th Cir. 2005), and Judge does not offer any argument as to why having a nurse conduct the review in the present case was arbitrary or capricious. We therefore hold that MetLife did not act arbitrarily or capriciously in conducting a file review.

**F.     Conflict of interest**

Finally, Judge claims that MetLife's conflict of interest tainted its decision to deny benefits. When a plan administrator "is both the payor of any . . . benefits and . . . vested with discretion to determine . . . eligibility for those benefits," this creates an " inherent conflict of interest." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311 (6th Cir. 2010). We consider this inherent conflict of interest as another factor in evaluating the quality of MetLife's decisionmaking process. *See id.*

The Supreme Court has noted that such a conflict "should prove more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). Judge, however, has pointed to nothing more than the general observation that MetLife had a financial incentive to deny the claim. After *Glenn*, this court has given greater weight to the conflict-of-interest factor when the claimant "offers more than conclusory allegations of bias." *DeLisle v. Sun Life Assurance Co. of Canada*, 558 F.3d 440, 445 (6th Cir. 2009). Here we find no circumstances indicating a need to give the conflict significant weight. *See Schwalm*, 626 F.3d at 311-12 (interpreting *Glenn* and finding no conflict of interest where the administrator "provided a thorough review of the record and there [was] no indication that the review was improperly influenced by the inherent conflict of interest").

## III. CONCLUSION

MetLife's decision to deny benefits was "the result of a deliberate, principled reasoning process" and "supported by substantial evidence." *See Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). We therefore **AFFIRM** the judgment of the district court.

---

**DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, dissenting in part.  In reviewing Judge's claim for disability benefits, MetLife twice applied the incorrect disability standard, relied on outdated medical records, discredited the conclusions of Judge's treating physicians without conducting an independent medical evaluation, and operated under a conflict of interest.  The majority nonetheless describes MetLife's review as a deliberate, principled reasoning process.  Such a determination departs from our binding precedent and does not comport with fundamental principles of fairness.  MetLife engaged in an arbitrary-and-capricious review of Judge's claim for benefits, and I therefore respectfully dissent in part.  I agree with the majority's holding that MetLife was not required to obtain a vocational expert in reviewing Judge's claim and concur in that portion of the majority opinion.

The heart of this appeal concerns the second denial letter that MetLife sent to Judge.  The majority rejects Judge's contention that MetLife never once applied the correct disability standard to Judge's claim and instead characterizes the incorrect portions of the second denial letter as "shorthand jargon."  I do not agree with the majority's characterization, particularly in light of the fact that this "shorthand jargon" happens to be an incorrect disability standard.  In fact, it happens to be the very disability standard that MetLife admits it incorrectly used in the initial denial letter.  As the majority would have it, I suppose, this is nothing more than mere coincidence.  To reach this conclusion, though, defies common sense.  MetLife does not dispute that it erred when it applied the following standard in the initial denial letter:  "The definition of disability requires that you be totally disabled and unable to work in any capacity and that you would never again be expected to perform any work activities."  A.R. at 170 (First Denial Letter).  Yet when this exact language is employed in the second denial letter—"The definition of disability requires that you be totally disabled and unable to work in any capacity and that you would never again be expected to perform any work

activities"—the majority is content to label it "shorthand jargon."**[1]**  A.R. at 186 (Second Denial Letter).  I cannot understand why the majority will not acknowledge that which is painfully obvious—MetLife made a mistake, and it is the kind of mistake that we have previously concluded constitutes arbitrary-and-capricious review.**[2]**  *See Elliott v. Metropolitan Life Ins. Co.*, 473 F.3d 613, 619 (6th Cir. 2006) ("Dr. Menotti's review bears a striking resemblance to MetLife's first denial letter."); *Burge v. Republic Engineered Prods., Inc.*, 432 F. App'x 539, 550 (6th Cir. 2011) (concluding that Republic's review was arbitrary and capricious in light of Republic having "applied a standard of 'total disability' that did not appear in the Plan").**[3]**

As further evidence that MetLife continued to employ the incorrect standard, the second denial letter fails to offer any analysis as to why Judge's condition would allow him to work in a job for which he is qualified by education, training, or experience.  Instead, MetLife assesses Judge's medical records under a decidedly incorrect standard; specifically, MetLife explains why Judge's condition would not preclude him from working in any job.  When discussing Judge's medical records, for example, MetLife reasons that Dr. Patel's July report "does not indicate you have any limitations with sitting, standing, walking, using your arms or hands or are unable to work in *any* capacity."  A.R. at 186 (Second Denial Letter) (emphasis added).  In *Elliott*, we concluded that a similar analysis was arbitrary and capricious, explaining that "there is

---

**[1]**There are two additional instances of such parity in the denial letters.  In the initial denial letter, MetLife states that "it has been determined that the information submitted is insufficient to support a functional impairment permanently precluding you from all work activities," and "there is insufficient clinical evidence of a severity of functional impairment that would preclude your ability to return to work." A.R. at 169–70 (First Denial Letter).  In the second denial letter, Metlife similarly asserts that "it has been determined that the information submitted does not support a severity of functional impairment permanently precluding you from all work activities," and "there is insufficient clinical evidence of a severity of functional impairment that would preclude your ability to return to work."  A.R. at 185–86 (Second Denial Letter).

**[2]**Contrary to the majority's suggestion, *Kalish v. Liberty Mutual/Liberty Life Assurance Co.*, 419 F.3d 501 (6th Cir. 2005), does not rebut this point.  In fact, the section of *Kalish* cited by the majority concludes as follows:  "the fact that Kalish might be capable of sedentary work cannot be a rational basis for finding that he was not disabled, given that his former occupation required him to walk, stand, and reach for several hours a day." *Id.* at 507.  Ultimately, we awarded benefits to Kalish. *Id.* at 513.

**[3]**The majority's reliance on *Cook v. Prudential Insurance Co.*, No. 11-3364, 2012 WL 3538520 (6th Cir. Aug. 12, 2012), an unpublished Sixth Circuit case concerning whether a denial letter must address every physician opinion in the record, is misplaced. *Elliott* and *Burge* squarely address the issue at hand.

no indication that MetLife reasoned from Elliott's condition to her ability to perform her occupation. There is no statement or discussion of Elliott's occupational duties or her ability, or inability, to perform them." 473 F.3d at 619. The same reasoning applies here. There is no indication that MetLife considered Judge's medical condition under the disability standard that it was required to apply. A letter with such an omission cannot be construed as deliberate and principled.

In addition to the plain language of the letter, MetLife's internal records confirm that it reviewed Judge's appeal under the incorrect standard. Diane Englert, the nurse who reviewed Judge's file, entered the following into the Claim Comments list, a document maintained by MetLife that tracks the progress of each claim: "After careful review of all the clinical information submitted by your treating providers . . . it has been determined that the information submitted does not support a severity of functional impairment permanently precluding you from *all work activities*." A.R. at 110–11 (Claim Comments List) (emphasis added). As with the letter, these comments mirror those made by the file reviewer who considered Judge's initial claim: "After careful review of all the clinical information submitted by your treating providers . . . , it has been determined that the information submitted is insufficient to support a functional impairment permanently precluding you from *all work activities*." *Id.* at 117 (emphasis added). Despite admitting that it erred in its review of Judge's initial claim, MetLife's internal records demonstrate that it continued to apply the incorrect standard throughout the review process.

The record is replete with evidence that MetLife assessed whether Judge would be able to perform *any* work activities rather than whether he would be able to perform those for which he was qualified by education, training, or experience. Under our binding precedent, a review is arbitrary and capricious when it does not accomplish even the very minimal requirement of evaluating the claim under the requisite disability standard. *See, e.g.*, *Jones v. Metropolitan Life Ins. Co.*, 385 F.3d 654, 665 (6th Cir. 2004) ("In this case, MetLife added an eligibility requirement under the guise of interpreting the term 'accident' that does not exist in either the Plan documents or federal

common law; therefore, MetLife's interpretation of the Plan is arbitrary and capricious.'"). I would therefore reverse on this ground.

I must also object to the majority's determination that no objective evidence supports Judge's claim for benefits. Judge's treating physician classified Judge as totally and permanently disabled and denoted the specific restrictions facing Judge that supported such a classification. A.R. at 127–28 (Deeb Statement). A second physician echoed the specific-restrictions findings, but was not asked whether Judge was totally and permanently disabled. A.R. at 165–66 (Harber Statement). The majority sets these opinions aside, reasoning that they should be discounted because the physicians merely checked boxes on forms without further elaboration. The majority fails to point out, though, that Judge's physicians submitted the form that MetLife provides to its claimants for the purpose of filing a claim of total and permanent disability. In fact, the "Instructions for Completing Group Life Insurance Statement of Review" indicate that the employee must "[g]ive the Attending Physician Statement to your treating physician for completion." A.R. at 122 (Instructions). There is no instruction requiring a claimant to provide an additional statement from his physician that explains why he filled out the form in the manner that he did, and there is not sufficient space on the form allocated for the physician to do so.[4] *Id.* Judge gave the MetLife forms to his two treating physicians, and those two physicians filled out the forms in their entirety. It is unreasonable for MetLife to provide forms requiring that a physician check boxes indicating the restrictions of his patient and then subsequently to deny that patient's claim because his physician failed to explain his reasoning behind checking certain boxes.

What I find to be even more confounding is MetLife's and the majority's reliance on outdated medical records to support their determination that the most recent reports of two physicians are in conflict with the medical record as a whole. Although MetLife and the majority are correct that in April 2010, less than one month after Judge's

---

[4]I disagree with the majority's characterization of the physician forms as providing space for "narrative responses." Although some space is allocated for comments, the most that a physician could write in the quarter of an inch reserved for this purpose is no more than a short sentence. In any event, both physicians made notations in the limited space available in response to the questions on the MetLife forms rattled off by the majority. The forms were thus completed in their entirety.

surgery, Deeb remarked in a post-operative report that Judge was "actually doing well" and was "awake, alert, oriented, and neurologically intact," I cannot understand how these comments are relevant to Judge's ability to return to work eight months later, let alone how they would require us to discount the final opinions of the two physicians responsible for directing Judge's recovery. A.R. at 141(Deeb Letter). The same can be said for the July 2010 report. It is unremarkable that a report midway through Judge's recovery period would note that his condition had improved since surgery and was likely to continue to improve as he completed the remainder of his physical therapy. A.R. at 139–40 (Patel Letter). As we explained in *Elliott*, "logically speaking, evidence of an improvement, without a starting or ending point, does not help answer the question of whether an individual can perform her occupation. 'Getting better,' without more, does not equal 'able to work.'" 473 F.3d at 620.

Likewise, both MetLife and the majority consider it a telling omission that the July 2010 report did not include restrictions on sitting, standing, or walking. Given that the July 2010 report, as labeled by the majority, is nothing more than a letter sent by one physician to another, I do not find such an omission significant. A.R. at 139–40 (Patel Letter). Unlike the October and December 2010 reports, this letter does not include a standardized form that requires the physician to denote specific restrictions. *Id.* Rather, the letter is a communication between Judge's physicians focused largely on the condition of his aortic valve. *Id.* The omission of these specific restrictions is thus not indicative of a sudden or unexplained change in opinion by either physician, as MetLife and the majority assert. In sum, I do not find these reasons—statements taken out of context from outdated medical records and a finding that MetLife's form is inadequate—convincing as a basis to deny benefits. An unadulterated review of the evidence makes clear that "MetLife did not rely on an application of the relevant evidence to the occupational standard when it denied [Judge's] claim initially and on internal appeal," and I would therefore reverse. *Elliott*, 473 F.3d at 618.

"While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber

stamping those decisions." *Helfman v. GE Grp. Life Assurance Co.*, 573 F.3d 383, 396 (6th Cir. 2009) (internal quotation marks omitted). Where, as here, a claim for disability benefits focuses on outdated medical statements and is reviewed under an incorrect disability standard, all while operating under a conflict of interest, that review is arbitrary and capricious. Having determined that MetLife engaged in an arbitrary-and-capricious review, I would remand "to MetLife for a full and fair inquiry." *Elliott*, 473 F.3d at 622. I therefore respectfully dissent.