THOMAS M. ROSE, UNITED STATES DISTRICT JUDGE
*827 Having prevailed in this Court on their argument that California law provided for a deferential standard of review of non-residents, on appeal Defendant Liberty Life Assurance Company of Boston agreed with Plaintiff Douglas Pfenning that a de novo standard applied. The United States Court of Appeals for the Sixth Circuit remanded the case for an opinion as to who would prevail under a de novo review.
Plaintiff Douglas Pfenning brought this action under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1972, 29 U.S.C. § 1132(a)(1)(B), against Defendant Liberty Life Assurance Company of Boston to enforce his right to disability benefits, demanding that Liberty account for past benefits and pay future benefits. Pfenning seeks payment of disability benefits during the claimant's "own occupation" period. Pfenning was employed by another insurance company, Farmers Group, Inc., as a Catastrophic Claims Adjuster. Pfenning's occupation with the Plan Sponsor required him to work outside an office environment, actively engaged with the public, doing physical work that required him to lift fifty pounds frequently. Liberty denied Pfenning long-term disability benefits for several reasons including insistence that he was a sedentary office worker. While many Insurance Claims Representatives are engaged in sedentary occupations, Pfenning was not.
I. Background
Farmers Group hired Pfenning in May 2002 as a Field Claims Representative and he enrolled in the company's Employee Welfare Benefit Plan, which is administered by Liberty. (LL000035, LL000465). When he applied for benefits in 2013, Farmers Group employed Pfenning as a "Catastrophic Adjustor-Mid-Loss-Field." (LL000466) According to Pfenning's description on the claims forms, his job requires him to handle mid-loss property claims due to fire, tornado, and hurricane; work 12-14 hours a day for 21 days straight; drive 3,000 miles a month; and climb up and down ladders, roofs and homes in order to inspect damages. (Id. ) The job description provided by Farmers Group, titled Senior Claims Representative-Property, lists similar duties. Under "Essential Job Functions," duties include investigating and confirming coverage, determining liability, establishing damages, reporting the status and negotiating the settlement of claims. (LL000528) It confirms that those employees "assigned to the Catastrophe team will be required to travel away from their residence for a specified period of time, usually consisting of 23 days." (Id. ) Physical demands are listed as bending, pulling sorting, carrying up to 50 lbs., pushing, climbing, reaching, standing, key entering, reading and writing English, walking, kneeling, and seeing. (LL000529) Finally, the description states that "[r]equired job duties are normally performed in a climate-controlled office environment," but the employee may be exposed to certain environments in the field:
"Uncontrolled outside environmental conditions
Excessive Noise Levels
Chemicals
Chemical/Biological Conditions
Moving Mechanical Parts
Areas considered to be dangerous *828 Conditions, which could affect the respiratory system or skin such as: fumes, odors, dust, mists, gases, oils, smoke, soot, or poor ventilation."
(Id. )
Under Section 2 of the plan, entitled "Definitions:"
"Disability" or "Disabled" means:
1. For persons other than pilots, co-pilots, and crew of an aircraft:
i. If the Covered Person is eligible for the 24 Month Own Occupation Benefit, "Disability" or "Disabled" means during the Elimination Period and the next 24 months of Disability the Covered Person is unable to perform all of the material and substantial duties of his occupation on an Active Employment basis because of an Injury or Sickness; and
ii. After 24 months of benefits have been paid, the Covered Person is unable to perform, with reasonable continuity, all of the material and substantial duties of his own or any other occupation for which he is or becomes reasonably fitted by training, education, experience, age and physical and mental capacity.
(LL000005) (emphasis added)[1]
Under Section 4, Disability Income Benefits, the plan states that Liberty will pay disability benefits if, upon request, it receives proof of continued disability and regular attendance of a physician. (LL000012) The "Elimination Period" is defined as "a period of consecutive days of Disability for which no benefit is payable," which is 26 weeks. (LL000003, LL000006)
A. Short-Term Benefits Claim
Pfenning began seeing a physician on April 22, 2013, when he visited Dr. Matthew O'Connell for chronic fatigue. (LL000235) Dr. O'Connell diagnosed him with fatigue, essential hypertension, and depression. (Id. ) Dr. O'Connell also noted that there may be some neuropathy as a result of excessive alcohol intake.[2] (Id. ) Pfenning returned to Dr. O'Connell's office August 29, 2013 complaining of daily foot pain, including numbness and tingling in both his legs below the knees, joint swelling, and fatigue. (LL000230-31)
Dr. O'Connell referred Pfenning to a spinal specialist, Dr. David Johnson, who conducted an electromyography (EMG) on September 9, 2013 and found evidence of injury possibly tied to a prior fall or to peripheral neuropathy. (LL000335) Dr. O'Connell ordered an MRI of Pfenning's spine during his visit on September 11, 2013. (LL000229).
On September 17, 2013 Pfenning filed a request for leave from his job for idiopathic neuropathy, with a start date of September 18 and an end date of November 2, 2013.[3] (LL000051, Claim Note 1) While his claim was being processed, Pfenning continued to seek medical attention for his condition. He returned to Dr. Johnson on September 26, 2013 complaining of significant swelling in his ankles and lower legs, as well as the constant burning in his feet. (LL000333-34) He followed up with Dr. O'Connell on October 7, 2013 for aggravation *829 of the burning and pain in his legs. (LL000223)
During this time, Liberty requested Pfenning's medical files from Dr. O'Connell, along with an Attending Physician Statement. (LL0000570, LL000580, LL000597) Dr. O'Connell's statement characterized Pfenning's prognosis as "poor," classified his physical impairment as a "[s]evere limitation of functional capacity; incapable of minimum activity," and noted that he had to change positions frequently. (LL000562) An MRI of Pfenning's brain raised the possibility of a demyelinating disease, but was not conclusive.[4] (LL000399)
Liberty approved Pfenning's claim for Short Term Disability benefits on October 21, 2013 for the time period of September 18 to November 4, 2013. (LL000556) Liberty extended short term disability benefits four more times, with a final termination of March 18, 2014, having paid six of a possible 24 months. (LL000045-48, Claim Notes 16, 20, 26, and 35)
Pfenning continued to consult with physicians during the time the short term disability benefits were paid. He visited Dr. Joel Vandersluis on October 29, 2013, who concluded that the abnormal MRI was likely related to alcohol intake and hypertension, but a more serious demyelinating disease could not be ruled out. (LL000254) He met with Dr. O'Connell the next day, October 30, to follow up on his symptoms. (LL000218-21)
Pfenning began visiting a neurologist, Dr. Kenneth Pugar, on December 6, 2013. (LL000197-98) He again returned to Dr. O'Connell on January 7, 2014 for an increase in pain, and again on January 10, 2014 after a visit to the ER for a nose bleed and dizziness. (LL000214-17, LL000210-13) He returned to Dr. Pugar on January 31 and March 10, 2014 for further evaluation. (LL000187, LL000248-49) He followed up with Dr. O'Connell on February 4, 2014 for dizziness and an issue with his balance, and again on February 19 for continued lightheadedness. (LL000205-09, LL000200-04) Liberty terminated Pfenning's short-term disability benefits on March 18, 2014. (LL00048, Claim Note 35)
B. Long-Term Benefits Claim Review
While paying out short term disability benefits, Liberty referred Pfenning's file to its Long-Term Disability department for review and possible pay-out of long-term benefits. (LL000045, Claim Note 36) Liberty hired the investigative firm ICS Merrill on January 24, 2014 to conduct surveillance on Pfenning. (LL000473) Between January 25 and 30, the investigator observed Pfenning conducting errands, showing that he lifted groceries, wore no visible braces or used any other orthopedic devices. (LL000476)
Liberty also ordered an Occupational Analysis and Vocational Review. Liberty's Case Manager, Amanda Voce, extrapolated from Pfenning's job description to an occupational title, in the Dictionary of Occupational Titles descriptions and two Standard Occupational Classification/Occupational Information Network ("SOC/O*NET") descriptions that reflect similar tasks. (LL000424-25) Tasks in the descriptions are "[i]nvestigate, analyze, and determine the extent of insurance company's liability concerning ... loss or damages, and attempt to effect settlement with claimants." (LL000425) Sample job titles under these definitions include Claims Representative, Claims Adjuster, Insurance Adjuster, and General Adjuster. (Id. ) Missing from any *830 of this are the requirements of Pfenning's actual job: "bending, pulling sorting, carrying up to 50 lbs., pushing, climbing, reaching, standing, key entering, reading and writing English, walking, kneeling, and seeing." (LL000529)
Voce nevertheless concluded that the physical demands of Pfenning's job with Framers Group as a Claims Examiner-Adjuster-Investigator were sedentary and light in physical demand. (LL000426) According to the Department of Labor, sedentary work is defined as "[e]xerting up to 10 pounds of force occasionally and/or a negligible amount of force frequently to move objects," "frequent to constant sitting," "frequent handling, fingering and reaching," and "occasional standing and walking." (LL000425-26) Light work is defined as "[e]xerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects," "frequent sitting, standing, reaching, handling and fingering," and "occasional walking and bending/stooping." (LL000426)
Finally, Liberty hired a neurologist, Dr. Frisso Potts, to conduct an in-house review of Pfenning's medical files. Dr. Potts contacted Drs. O'Connell, Pugar, and Johnson, as well as attending physical therapists, requesting more information regarding Pfenning's neuropathy, plans for pain management and return to work, the role of alcohol abuse in the current clinical status, but made no examination. (LL000347-50, LL000356-61, LL000387, LL000389) He inquired into the other doctors opinions regarding Pfenning's ability to function at work. (LL000349) The only attending physician that responded was the physical therapist, who confirmed Dr. Potts' eventually proposed restrictions and limitations on work capacity. (LL000370) Dr. Potts also reviewed the surveillance gathered by ICS. (LL000367)
Dr. Potts established that while Pfenning's diagnosis of generalized peripheral polyneuropathy resulted in difficulty in balance on certain surfaces and circumstances as well as pain, neither condition rose to the level of general impairment as evidenced by the intermittent surveillance of Pfenning.[5] (LL000366) He found no restrictions and limitations on sitting, driving, light or force grasping, and "fingering/typing or reaching at or below shoulder level," but listed restrictions as "[s]tanding and walking on an occasional basis in an 8 hour workday," "[n]o walking, on wet or uneven ground, or in low light environment," "[n]o climbing ladders," "[s]quatting, bending or kneeling on an occasional basis in an 8 hour workday" (but avoiding those activities in a low light environment or uneven/wet surfaces), "avoid activities in unprotected heights or near unprotected large bodies of water," "pushing/pulling up to 10 pounds while standing/walking and up to 20 pounds while sitting, on an occasional basis in an 8 hour workday," "no reaching overhead, as this may cause loss of balance," and "lifting up to 10 pounds on an occasional basis in an 8 hour work day while standing/walking." (LL000367) Finally, Dr. Potts concluded that Pfenning sustained "full time work capacity." (Id. )
Ultimately, Liberty denied Pfenning's long term disability benefits on March 14, 2014 based on the Occupational Analysis, the surveillance, and Dr. Potts' review. (LL000342-46) Liberty determined that Pfenning "retain[ed] the capacity to perform [his] occupation," and thus did not meet the Plan's definition of disability. (LL000345) It advised Pfenning that he could appeal the denial. (Id. )
*831 C. Appeal
Upon denial of benefits, Pfenning informed Liberty of his intent to appeal. (LL000039, Claim Note 33) He submitted a formal appeal August 12, 2014, along with a vocational review, a Functional Capacity Evaluation, and a letter from Dr. Pugar. (LL000139)
First, Pfenning submitted a vocational review by Mark Pinti, a vocational rehabilitation specialist. After meeting with Pfenning and examining several records, including the job description from Farmers, Liberty's Occupational Analysis, and the Functional Capacity Evaluation, Pinti concluded that Pfenning was "no longer capable of performing the duties and functions of the job of a Catastrophe Claim Adjuster," and that he "would be incapable of performing a Claim Adjuster job, and [was] most likely incapable of performing even sedentary work activity." (LL000154)
Next, Pfenning submitted a Functional Capacity Evaluation, conducted on June 13, 2014 by Dr. Rick Wickstrom. (LL000161-77) Dr. Wickstrom concluded, based on Pfenning's level of function at that time and his work description, Pfenning was only able to lift or carry one to five pounds, push up to 30 pounds. (LL000177) His ambulation agility and stamina, climbing, keyboard speed, finger dexterity, and manual dexterity were all classified as very low. (Id. ) Standing, operating foot controls, reaching above the shoulder, and forward bending/stooping were all classified as occasional, while sitting was classified as frequent. (Id. ) Finally, Dr. Wickstrom recommended that Pfenning be "restricted from all job duties that require climbing of ladders, walking on uneven grounds, prolonged sitting in a constrained posture to drive between locations and carrying of 50 lbs." (Id. )
Dr. Wickstrom made note of his concern regarding an inconsistency in Pfenning's evaluation:
Pfenning was cooperative; however he reports multiple areas of subjective complaints [and] demonstrated multiple inconsistencies that made this examiner question his reliability and validity on many functional tests that were administered during this exam. His performance was substantially limited by poor agility, yet he has not used an assistive device recently.
(Id. )
Finally, Pfenning submitted a letter from Dr. Pugar that mentioned the possibility of a diagnosis of multiple sclerosis ("MS"), but warned that further tests were required due to the difficulty in establishing the presence of such a disease. (LL000194-96)
Upon notice of appeal, Liberty submitted the Occupational Analysis previously completed by Voce to its employee, Michelle Reddinger, a vocational case manager, for a review. (LL000091-96) This review considered all of the information that was part of the first Occupational Analysis, and included the vocational review conducted by Pinti. (LL000092) In her review, Reddinger pointed out that, while Pinti found that the work of a Catastrophe Claim Adjuster could not be performed at a sedentary or light physical demand level, Pfenning "is insured by his [Plan] for his own occupation rather than his own job." (LL000094) (emphasis original) She then reached outside of the contract for definitions of "job" and "occupation" according to The Quick Desk Reference for Forensic Rehabilitation Consultants:
A job is a group of positions within an establishment which are identical with respect to their major or significant tasks and sufficiently alike to justify their being covered by a single analysis. There may be one or many persons employed in the same job.
*832 An occupation is a group of jobs, found at more than one establishment, in which a common set of tasks are performed or are related in terms of similar objectives, methodologies, materials, products, worker actions, or worker characteristics.
(Id. ) Reddinger affirmed the original opinion that Pfenning's job of Catastrophe Claims Adjuster was one of the jobs within the global occupation of Claim Examiner/Adjuster/Investigator, with two manners of performance on the national economy: "sedentary (inside) and light (outside)." (LL000095)
Liberty hired Dr. David Lang, a neurologist, and Dr. Sarah White to conduct a peer review of Pfenning's medical records, the Functional Capacity Evaluation, the Occupational Analysis, the vocational review, Dr. Potts' in-house review, the surveillance video and report, all job descriptions from Pfenning and Farmers, any attorney correspondence, and internal case notes. (LL000107-08) They attempted to contact both attending physicians; Dr. Lang never received a return phone call from Dr. Pugar, and Dr. O'Connell refused to discuss Pfenning's functionality from a physical perspective with Dr. White. (LL000108, LL000109)
Dr. Lang concluded that, based on inconsistencies presented in the medical evidence and the lack of a definitive diagnosis, Pfenning presented no impairment or restrictions or limitations. (LL000115) Dr. Lang noticed several points of inconsistency. First, Pfenning reported memory loss, but his physicians documented normal mental status examinations. (Id. ) Pfenning admitted to drinking alcohol on a daily basis to one physician but reported to other physicians that he had stopped drinking for several years. (Id. ) Dr. Lang also points out Dr. Wickstrom's note regarding an inconsistency during the Functional Capacity Evaluation. (Id. ) Finally, Dr. Lang opines that the surveillance showing Pfenning's ability to walk, stand, and drive was contrary to his reports in the activity questionnaire that he needed assistance walking, suffered multiple falls over time, and had the ability to sit and stand for only a very limited period of time. (LL000116) Due to these inconsistencies, Dr. Lang concluded that Pfenning was able to "perform even sedentary work on a sustained full time basis." (LL000117)
Dr. White's review echoed the same concerns expressed by Dr. Lang. She noted that, due to the uncertainty "whether or not Pfenning displayed full effort throughout testing" that resulted in inconsistencies, the Functional Capacity Evaluation results were invalid. (LL000119) Inconsistent strength and weakness as listed in the evaluation are evidence of this lack of full effort. (LL000118) Dr. White opines that Pfenning is able to perform sedentary work on a full time basis because nothing in the medical records documented a significant loss of strength or muscle atrophy, there was no indication of the need for an assistive device, and there was nothing in the medical records to support "an inability to lift, carry, push or pull up to 10 pounds occasionally." (LL000120)
On November 12, 2014, Pfenning submitted a letter from Dr. Pugar asserting that he "more than likely has a diagnosis of Multiple Sclerosis." (LL000088) Liberty submitted the letter to Dr. Lang for consideration in the peer review. Dr. Lang did not change his conclusions. (LL000071) He reasoned that the additional documentation did not provide any information to support any functional impairment, limitation or restriction nor did it support any functional impairment; that, while MS is a neurological disease, it did not necessarily imply functional impairment at that time; and that the additional information did not *833 clarify the previously documented inconsistencies. (Id. )
Liberty determined that Pfenning did not meet the Plan's definition of disability from his own occupation for either category of benefits, and issued its second and final denial on November 24, 2014. (LL000061-68) Pfenning filed the current action on January 16, 2015. (LL000037, Claim Note 54) On December 28, 2015, summary judgment was entered in favor of Defendant. Plaintiff appealed January 25, 2016. (ECF 19) When Defendant changed positions, the Sixth Circuit vacated the prior decision. (ECF 20) Now pending before the Court is Plaintiff's Motion for Judgment on the Administrative Record. (ECF 25)
II. Standard of Review
A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is reviewed de novo ; however, if the benefit plan grants to itself discretionary authority either to determine eligibility for benefits or to construe the terms of the plan, the denial is reviewed under an arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch , 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) ; Smith v. Bayer Corp. Long Term Disability Plan, 275 Fed. App'x. 495, 504 (6th Cir. 2008). The parties agree, however, that California law prohibits discretionary language in policies such as this. The Group Disability Income Policy states under Section 7-General Provisions, "Interpretation of the Policy", that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (LL000025). Under the heading "Conformity with State Statutes" in the General Provisions, the policy states "[a]ny provision of this policy which, on its Effective Date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such state." (LL000028) The first page of the policy declares that the governing jurisdiction is California and that the policy is subject to the laws of that state. (LL000001). California Insurance Code states:
If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.
Cal. Ins. Code § 10110.6(a) (2015).
III. Analysis
In reviewing the denial, this Court is confined to the record that was before Liberty for consideration. Wilkins v. Baptist Healthcare Sys., 150 F.3d 609, 615 (6th Cir. 1998). Pfenning argues in his Motion for Judgment on the Administrative Record that Liberty acted in an arbitrary and capricious manner when Liberty (1) determined his occupation was sedentary, and (2) ignored the Functional Capacity Evaluation and his diagnosis in its decision. Conversely, Liberty's response, seemingly unaware of the standard it has agreed to, argues that its decision was rational.
A. Liberty's Determination of "Own Occupation"
Pfenning argues that Liberty erred when it used the Dictionary of Occupational Titles to determine "own occupation" instead of on the actual job descriptions provided by himself and Farmers. Citing *834 Calhoun v. Group Long-term Disability Plan for Employees of NK Parts Industries, Inc., No. 3:10-cv-271, at 15-16, PAGEID #: 416-17 (S.D. Ohio July 18, 2011) (Rose, J.) (reversal of denial of benefits because the plan administrator determined the specific job instead of the occupation, failed to establish the essential duties of that occupation, and failed to consider the employee's ability to perform those essential duties); Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618 (6th Cir. 2006) (holding that plan administrator did not make a reasoned judgment when it failed to apply relevant medical evidence to the occupational standard); Geiger v. Pfizer Inc., 918 F.Supp.2d 697, 704-05 (S.D. Ohio 2013) (Smith, J.) (remand to plan administrator for consideration of plaintiff's occupational requirements in determination of benefits).
Plaintiff also draws attention to decisions on this issue against Liberty by other courts. For example, in Kavanay v. Liberty Life Assur. Co., Liberty denied long term disability benefits to an insured employee after the vocational analysis determined the Dictionary of Occupational Titles category of a sedentary occupation, despite the fact that the employee indicated his job duties included tasks requiring physical demand, such as frequent standing and walking. 914 F.Supp.2d 832, 834-35 (S.D. Miss. 2012). The court held that Liberty's denial was arbitrary and capricious because it disregarded the nature of the position and the specific tasks required to perform the duties. Id. at 836.
While the Sixth Circuit has established that "occupation" is general and flexible enough to justify determining duties in light of Dictionary of Occupational Titles "rather than examining in detail the specific duties the employee performed." Osborne v. Hartford Life & Accident Ins. Co., 465 F.3d 296, 299 (6th Cir. 2006) (" 'Occupation' is a more general term that seemingly refers to categories of work than narrower employment terms like 'position,' 'job,' or 'work,' which are more related to a particular employee's individual duties."), the general Dictionary of Occupational Titles descriptions used to define material duties must involve comparable duties as the individual job. Id.
The Plan does not define "own occupation" or "occupation" in general. While use of the Dictionary of Occupational Titles to define "own occupation" is rational, it does not accord with a natural reading of the contract. Such a reading allows for the possibility of an employee, thinking he had coverage for disability, being displaced by disability from what Liberty describes as "own job" but not necessarily own occupation, though same employee may find an economic downturn, or even the challenge of obtaining a position within his "own occupation" while partially disabled an impossibility. Liberty seeks to render disability coverage even more illusory than it already was. It appears clear that Pfenning's progressive deterioration will eventually render him permanently disabled, but it is already resolved that he will not have succeeded in holding onto his employment long enough for that disability to result in long-term disability payments. Liberty seeks to deprive him of even short-term payments as well. A range of jobs can fit into one occupation, some with sedentary capacity and others with light work capacity. ( Id. ).
Pfenning's own occupation contains additional field duties beyond those listed in the Dictionary of Occupational Titles definition. His "Essential Job Functions" include physical demands such as bending, pulling sorting, carrying up to 50 lbs., pushing, climbing, reaching, standing, walking, and kneeling. (LL000529) He may be exposed to uncontrolled outside environmental conditions, moving mechanical *835 parts and areas considered to be dangerous. ( Id. )
While Liberty may not have acted in an arbitrary and capricious manner, the Court, considering the matter de novo , does not agree with it and finds that Pfenning was unable to perform his own occupation and is entitled to short-term disability benefits.
A Functional Capacity Evaluation is considered objective evidence "gauging the extent one can complete work-related tasks," Caesar v. Hartford Life & Accident Ins. Co., 464 Fed. App'x. 431, 435 (6th Cir. 2012), and rejecting one requires explanation. See Calvert v. Firstar Fin., Inc., 409 F.3d 286, 296 (6th Cir. 2005) ; Brooking v. Hartford Life and Acc. Ins. Co., 167 F. App'x. 544, 549 (6th Cir. 2006) ; and Bowers v. Hartford Life & Accident Ins. Co. , No. 2:09-CV-290, 2010 WL 1963412, 2010 U.S. Dist. LEXIS 48157 (S.D. Ohio May 17, 2010). Given the deference this Court accords treating physicians, it disagrees with Liberty and finds Pfenning entitled to short-term disability insurance benefits. The Court is loath to reject the findings of an attending physician without an independent medical examination.
IV. Conclusion
Pfenning's physicians found him incapable of performing his own occupation, the one he was insured against losing by way of disability. Therefore, Plaintiff's Motion for Judgment, doc. 25, is GRANTED . The Clerk is ORDERED to enter judgment in favor of Plaintiff. The captioned cause is hereby TERMINATED upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.
DONE and ORDERED in Dayton, Ohio, this Monday, June 26, 2017.

Because Pfenning was never awarded the first 24 months of benefits, only definition 1(i) applies in this case.

Neuropathy is a disease of one or more peripheral nerves that typically causes numbness or weakness.

Idiopathic neuropathy is neuropathy where a cause cannot be determined.

A demyelinating disease is a condition that results in damage to the protective covering surrounding nerve fibers in the brain and spinal cord, causing nerve impulses to slow and resulting in neurological problems.

Generalized peripheral polyneuropathy is damage to the peripheral nerves, often causing weakness, numbness and pain in the hands and feet.