*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0013p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PATRICIA ELLIOTT,

  *Plaintiff-Appellant,*

> No. 05-6633

  *v.*

METROPOLITAN LIFE INSURANCE COMPANY,
  *Defendant-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 04-00174—David L. Bunning, District Judge.

Argued: October 25, 2006

Decided and Filed: November 15, 2006[*]

Before: BOGGS, Chief Judge; DAUGHTREY, Circuit Judge; and MILLS, District Judge.[**]

---

## COUNSEL

**ARGUED:** Stephen C. Emery, STEWART, ROELANDT, STOESS, CRAIGMYLE & EMERY, Crestwood, Kentucky, for Appellant. Angela Logan Edwards, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellee. **ON BRIEF:** Stephen C. Emery, John Frith Stewart, STEWART, ROELANDT, STOESS, CRAIGMYLE & EMERY, Crestwood, Kentucky, Michael D. Grabhorn, GRABHORN LAW OFFICE, Louisville, Kentucky, for Appellant. Angela Logan Edwards, Lisa H. Thomas, WOODWARD, HOBSON & FULTON, Louisville, Kentucky, for Appellee.

---

[*] This decision was originally issued as an "unpublished decision" filed on November 15, 2006. On January 4, 2007, the court designated the opinion as one recommended for full-text publication.

[**] The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

---

**OPINION**

---

BOGGS, Chief Judge.   This case presents the questions of whether an ERISA plan's determination to deny benefits was arbitrary and capricious and, if it was, what remedy this court should order.  Patricia Elliott submitted a claim for long-term disability benefits to the administrator of her employer's employee benefit plan, Metropolitan Life ("MetLife").  MetLife denied Elliott's claim.  Thereafter, Elliott brought this ERISA action, based on the administrative record, against MetLife for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B).  MetLife moved for judgment affirming its decision to deny benefits and Elliott moved for reversal.  Holding that MetLife's determination to deny benefits was not "arbitrary and capricious," the district court granted MetLife's motion and denied Elliott's motion.  Elliott appealed to this court.

Because we conclude that MetLife's decision was arbitrary and capricious, we vacate the judgment of the district court.  The record does not support the conclusion that MetLife's denial of Elliott's claim was the result of a deliberative, principled reasoning process.  We cannot say, however, that Elliott is clearly entitled to long-term disability benefits.  Consequently, we remand to the district court with instructions to remand to MetLife for a full and fair review consistent with this opinion.

I

Elliott was injured severely in a car accident in 1989.  At that time, she suffered significant fractures of her second and third cervical vertebrae.  Soon after, she underwent stabilization and spinal surgery, which involved the placement of metallic wires in her neck.  In 1993, Elliott began working for Great American Financial Resources and joined the company's employee benefit plan, which MetLife administers.

In October 2002, Elliott began experiencing renewed pain related to the 1989 accident, including radiating shoulder pain, numbness, and burning sensations.  She saw several physicians, beginning with Dr. Charles Kuntz of the University of Cincinnati's Mayfield Clinic.  In early 2003, Elliott began receiving short-term disability benefits, after Dr. Kuntz submitted a form to Great American certifying that she could not perform work of any kind.  While on short-term disability in early 2003, Elliott visited several physicians and had numerous studies conducted.  None could explain with precision why Elliott's symptoms had reemerged.

In May 2003, Dr. Kuntz referred Elliott to Dr. Alex Schneider at Aring Neurology at the University of Cincinnati.  Dr. Schneider conducted an initial electromyogram and found "no signs of motor or myelopathic symptoms."  However, he also made findings "consistent with a central cord-like syndrome."  In addition, Dr. Schneider wrote: "She is better than she was six months ago, but continued to have some chronic pain and anxiety related to this."  Dr. Schneider recommended, among other things, Elavil (a psychoactive prescription drug often prescribed for depression), a C-collar (used to stabilize the neck), physical therapy, and a re-evaluation in three months.

Dr. Schneider saw Elliott again in August 2003.  He made no significant new findings at that visit, except to note: "since starting the Elavil, she has done quite better [sic].  She states she is moving around better and her neck pain is better."  However, Dr. Schneider did report that she "has some weakness and numbness when she is up too long, particularly in her legs and feet."  Dr. Schneider increased her prescription, ordered more physical therapy, and recommended a return visit in three months, a date that coincides with Elliott's most recent MRI.

In September 2003, Elliott began the long-term disability claims process. Her claim was denied on December 1, 2003, in a letter from MetLife. In the letter, MetLife recounts the plan's terms and restates technical medical terms from Elliott's doctors' reports. Then, without reasoning, the letter concludes: "The medial [sic] documentation does not support a condition of a severity that would prevent you from working."

On December 9, 2003, Elliott sent a letter to MetLife appealing the decision. In the letter, Elliott wrote that her "condition has improved since the increase of [her] Elavil" prescription. She also wrote that "if I stand, sit, bend, walk, or sit up straight for too long, I require pain medication." *Ibid.* Describing her physical abilities, she wrote that "I have improved in motor skills since therapy and can tend to my daily needs without assistance. I can do some housework most days but am restricted to light duty (dusting, dishwasher, straightening, etc.. [sic])."

Elliott also included a letter from Dr. Schneider, dated December 9, 2003. In the letter, he described Elliott's condition as "chronic weakness and numbness that is exacerbated when she is standing for any length of time." Dr. Schneider also recounted Elliott's last MRI, dated November 24, 2003, which showed "surgical changes along with mild to moderate diskogenic disease and degenerative changes." There was "no clear syringomyelia,"[1] although "metallic artifact limits the parenchymal visualization."[2] Following that discussion, Dr. Schneider specified particular limitations on Elliott's ability to work. He wrote:

> It is my opinion that her work is limited due to her chronic pain syndrome and spinal cord injury that is exacerbated by spending any length of time on her feet or sitting in a single position for any length of time. She should not do any lifting. She should not be crouching into small spaces or doing any repetitive motion type of work. She should not do any work that requires reaching above her head. It is my opinion that her chronic neurologic condition causes her significant disability. This condition is chronic and will likely worsen in the future. Furthermore, she may require further surgical intervention as she develops further arthritic changes.

In response to Elliott's appeal, MetLife engaged Dr. Robert Menotti to review Elliott's file. The record indicates that MetLife sent Elliott's file to Dr. Menotti on February 25, 2004, and that he completed his review the next day. In the review, Dr. Menotti recounted Elliott's medical history. Although Dr. Menotti conceded that Dr. Schneider's statement "appears to be . . . credible," he nevertheless asserted that Elliott's "condition improved over time with respect to her chronic pain," especially with medication. Dr. Menotti then concluded that: "I am not left with the impression given the current level of documentation that the claimant appears medically unable to perform sedentary work based on the physical findings supplied by Dr. Schneider and by Dr. Kuntz." Dr. Menotti was the first physician to mention the term "sedentary work," which does not appear in the plan at issue.

Based on Dr. Menotti's findings, MetLife denied Elliott's appeal. In its letter to Elliott, MetLife again recounted her medical history, including the latest reviews by Dr. Schneider and Dr. Menotti. Again without reasoning, MetLife then wrote: "There was no indication that your condition caused impairments which that would have prevented your [sic] from performing the duties of your job. Therefore, the original claim determination was appropriate."

---

[1]Syringomyelia is "a slowly progressive syndrome of cavitation in the central segments of the spinal cord, generally in the cervical region." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1841 (2003).

[2]This portion of Dr. Schneider's letter indicates that metallic artifacts from Elliott's 1989 surgery limit his ability to see, using the test methods employed, the functional parts of the relevant portion of her spinal cord.

Following the denial of her appeal, Elliott brought an ERISA action against MetLife for wrongful denial of benefits under 29 U.S.C. § 1132(a)(1)(B). MetLife moved for judgment affirming its decision to deny benefits and Elliott moved for reversal. The district court granted MetLife's motion and denied Elliott's motion. Elliott appealed.

## II

We review *de novo* the decision of a district court granting judgment in an ERISA disability benefit action based on an administrative record. *See Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 665-66 (6th Cir. 2006); *Whitaker v. Hartford Life & Accident Co.*, 404 F.3d 947, 949 (6th Cir. 2005); *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 613 (6th Cir. 1998). In addition, when a plan grants the administrator discretionary authority to interpret the terms of the plan and to determine benefits, courts will only reverse an administrator's determination if it is "arbitrary and capricious." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111-15 (1989); *Glenn*, 461 F.3d at 666; *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 168 (6th Cir. 2003). Because the MetLife plan at issue in this case provides for discretion, we apply the "arbitrary and capricious" standard of review.

Although that standard is deferential, it is not a rubber stamp for the administrator's determination. *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004). In other words, "deferential review is not *no* review." *McDonald*, 347 F.3d at 172 (citing *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001)). Under that standard, we will uphold the administrator's decision "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Glenn*, 461 F.3d at 666 (citing *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.3d 1140, 1144 (6th Cir. 1991)).

The question in any given disability case on "arbitrary and capricious" review is whether a plan can offer a reasoned explanation, based on the evidence, for its judgment that a claimant was not "disabled" within the plan's terms. In pertinent part, the MetLife plan at issue here reads as follows: "'Disabled' or 'Disability' means that, due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and . . . during your Elimination Period and the next 24 month period, you are unable to earn more than 80% of your Predisability Earnings or Indexed Predisability Earnings at your Own Occupation for any employer in your Local Economy." The plan defines "Own Occupation" as: "the activity that you regularly perform and that serves as your source of income. It is not limited to the specific position you held with your Employer. It may be a similar activity that could be performed with your Employer or any other employer."

Those terms are clear. To ascertain whether a claimant is disabled, MetLife must determine whether the individual's condition (sickness, pregnancy, or accidental injury) precludes her from performing her "Own Occupation." Once MetLife makes that judgment, its determination is entitled to deference unless it is arbitrary and capricious. That is, if MetLife's determination that an individual can perform her occupation "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," it will not be disturbed. *Glenn*, 461 F.3d at 666 (citing *Baker*, 929 F.3d at 1144).

## III

## A

We must therefore determine whether MetLife made a deliberate, principled, and reasoned decision that Elliott's condition would not preclude her from performing her occupation. At the district court level, MetLife submitted an official description of the duties of an employee with

Elliott's former occupation as a Business Quality Analyst.[3]  Elliott does not contest the use of that description here.[4]  As such, we will treat Elliott's official job description as giving the duties of her "Own Occupation" for analytical purposes.

A Business Quality Analyst's essential responsibilities, *inter alia*, are to: (1) "Develop and prepare routine and non-routine reports needed from administration systems to effectively audit business activity"; (2) "Coordinate with other business areas to clarify/correct data"; (3) "Edit and review reports with management to ensure they meet business needs"; and (4) "Work with IT/Policy Administration support to drive effectiveness of reports needed."  To further those objectives, the company specified some of the skills that would be required, including proficiency in some computer software.

B

We must now ask whether MetLife made a reasoned judgment that Elliott's medical condition allowed her to perform those or similar duties.  Logically, MetLife could have made a reasoned judgment only if it relied on medical evidence that assessed Elliott's physical ability to perform job-related tasks.  *McDonald*, 347 F.3d at 172 (citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (The plan "was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job.")).  *See also Osborne*, 465 F.3d at 298 (affirming the denial of benefits, in part, because claimant "was once again able to perform the duties of his position"); *Glenn*, 461 F.3d at 669-70.  Put differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability.  Despite the numerous medical evaluations that took place in this case, MetLife did not rely on an application of the relevant evidence to the occupational standard when it denied her claim initially and on internal appeal.

1

In its first denial letter, before having Elliott's file reviewed by a physician consultant, MetLife merely recounted the technical contents of Elliott's various medical evaluations.  For example, MetLife wrote, "Per the April 22, 2003 office note from Dr. Kuntz the findings of the January 14, 2003 EMG revealed normal nerve conduction of the bilateral upper and lower limbs.  Review of the CT of the cervical spine dated March 21, 2003, shows no evidence of significant central canal stenosis. . . .  It was suggested that you get a neurological consultation."  Then the letter says: "The medial [sic] documentation does not support a condition of a severity that would prevent you from working."

We note that, in the first denial letter, MetLife states that it considered Elliott's job description.  Nevertheless, there is no indication that MetLife reasoned from Elliott's condition to her ability to perform her occupation.  There is no statement or discussion of Elliott's occupational duties or her ability, or inability, to perform them.  Instead, the denial letter is a mere recitation of

---

[3]The district judge thought that the job description meant that Elliott's job was "sedentary in nature."  The court then concluded that MetLife's denial of benefits, based on Dr. Menotti's conclusion that Elliott could perform "sedentary work," was not arbitrary and capricious.  That reasoning, also relied on by MetLife on appeal, was in error because it relies on a general notion of "sedentary" work rather than on the duties that Ms. Elliott's occupation entailed.  The latter inquiry is the proper one under the plan's terms.

[4]Indeed, as we recently held, MetLife's determination of what duties Elliott's job entailed would be entitled to review under the "arbitrary and capricious" standard of review.  *Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006).  In *Osborne*, we held that employing the dictionary to determine someone's job duties was not "arbitrary and capricious."  *Ibid.*  Certainly, under *Osborne*, MetLife's employment of Elliott's official job description must also be entitled to deference.

medical terminology employed by various physicians in their diagnoses of Elliott's condition, without any reasoning as to why those diagnoses would permit her to function in the workplace. A court's decision that merely said "affirmed" or "reversed" could not be considered "reasoned." Similarly, MetLife cannot be said to have given a *reasoned* denial of Elliott's claim, initially.

2

Elliott appealed that initial determination, adding a letter from Dr. Schneider that related her condition to her work ability. In denying her appeal, MetLife relied on only one other new piece of evidence: the opinion of a physician consultant, Dr. Robert Menotti, who conducted a file-only review of Elliott's claim. Because MetLife's initial denial lacked a reasoned basis, MetLife's second denial can only be characterized as "reasoned" if Dr. Menotti's review provided an adequate basis to conclude that Elliott could perform her occupation despite her medical condition.

Dr. Menotti's review bears a striking resemblance to MetLife's first denial letter. In similar fashion, Dr. Menotti stated nearly verbatim from MetLife's letter the technical findings related to Elliott's condition. That recitation occupies more than half of Dr. Menotti's two-page review. *Cf. Kalish*, 419 F.3d at 509 (rejecting as inadequate a report recounting six pages of medical history and engaging in only one page of analysis). In addition, Dr. Menotti presented no reasons for his conclusion that Elliott's condition would not preclude her from working. He never discussed Elliott's job duties, which implies that he did not conduct a reasoned evaluation of her condition to determine whether she could perform those duties.

To be sure, Dr. Menotti discussed Dr. Schneider's conclusions about Elliott's limited work ability.[5] In fact, he explicitly stated that Dr. Schneider's conclusions "appear[ed] to be credible." Yet Dr. Menotti offered no specific rebuttal to Dr. Schneider's conclusions, nor did he opine as to how Elliott's medical condition related to the demands of her job. Instead, Dr. Menotti concluded that earlier records demonstrated that Elliott's condition "improved over time" and that her "chronic pain syndrome has responded to . . . medication." However, logically speaking, evidence of an improvement, without a starting or ending point, does not help answer the question of whether an individual can perform her occupation. "Getting better," without more, does not equal "able to work."

Moreover, based on his determination that Elliott was improving, Dr. Menotti stated a conclusion that is arguably on a different plane than the proper inquiry. He wrote: "I am not left with the impression given the current level of documentation that the claimant appears medically unable to perform sedentary work." The term "sedentary work" appears nowhere in the plan's terms. As we have noted, the proper inquiry is whether Elliott could perform her own occupation. Dr. Menotti never undertook such an inquiry.

In addition, Dr. Menotti was a physician consultant frequently employed by MetLife. The Supreme Court has acknowledged "that physicians repeatedly retained by benefits plans may have an incentive to make a finding of 'not disabled' in order to save their employers money and to preserve their own consulting arrangements." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). *See also Kalish*, 419 F.3d at 507-08. Dr. Menotti's conclusions have been

---

[5]Dr. Menotti notes Dr. Schneider's finding that Elliott's work ability "is limited due to her chronic pain syndrome and spinal cord injury that is made worse by spending any length of time on her feet or sitting in a single position for any length of time." Dr. Menotti also noted Dr. Schneider's view that Elliott's condition "is chronic and will likely worsen in the future and she may require further surgical intervention if she develops further arthritic changes." Here, however, Dr. Menotti misquotes Dr. Schneider's letter. Schneider wrote that Elliott may require surgery *as* she develops further arthritic changes, indicating that an ongoing process of arthritic degeneration was taking place. Dr. Menotti's letter changes "as" to "if," which alters the meaning of the sentence by rendering further arthritic change only a possibility.

questioned in at least three federal cases; in all of them, he was hired by MetLife. *See White v. Airline Pilots Ass'n*, 364 F. Supp. 2d 747, 754 (N.D. Ill. 2005) ("The doctor's language appears deliberately ambiguous and vague. . . ."); *Viglietta v. Metro. Life Ins. Co.*, 04 Civ. 3874, 2005 U.S. Dist. LEXIS 42924, at *32 (S.D.N.Y. Aug. 3, 2005) ("It is, however, highly unlikely that Dr. Menotti considered Plaintiff's revised job description . . ."); *Smith v. Home Depot Welfare Benefits Plan*, No. 8:04-cv-1924-T-23TBM, 2005 U.S. Dist. LEXIS 42916, at *36 (M.D. Fla. Nov. 17, 2005).

We express no opinion on whether Dr. Menotti was, in fact, influenced in this matter by his frequent employment by MetLife. It is clear, however, that he failed to conduct the appropriate inquiry. Dr. Menotti's statements cannot form the basis for concluding that MetLife engaged in a deliberate, principled reasoning process in this case. *Glenn*, 461 F.3d at 666.

3

Nothing else in MetLife's second denial provides any indication that MetLife engaged in a principled reasoning process. MetLife failed to offer any reason for rejecting Dr. Schneider's conclusions about Elliott's ability to work. Generally speaking, a plan may not reject summarily the opinions of a treating physician, but must instead give reasons for adopting an alternative opinion. *Evans v. Unumprovident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) ("[A] plan administrator may not arbitrarily disregard reliable medical evidence proffered by a claimant, including the opinions of a treating physician.") (citing, *inter alia*, *Black & Decker*, 528 U.S. at 833; *McDonald*, 347 F.3d at 163-66). Dr. Schneider's letter indicated that Elliott would have trouble sitting for long periods of time and performing repetitive movements, both of which could well fall within her job description. Of course, MetLife need not defer automatically to the treating physician's opinion. *Black & Decker*, 538 U.S. at 830-32. However, that MetLife gave "greater weight" to a non-treating physician's opinion for no apparent reason lends force to the conclusion that MetLife acted arbitrarily and capriciously. *See Kalish*, 419 F.3d at 508 (citing *Calvert*, 409 F.3d at 295).[6]

In addition, MetLife sought only a file review of Elliott's claim, rather than a physical examination. To be sure, we rejected in *Calvert* a claimant's assertion that a plan with *authority* to order additional medical tests was *required* to do so. 409 F.3d at 296. However, we also held that a plan's decision to conduct a file-only review–"especially where the right to [conduct a physical examination] is specifically reserved in the plan–may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Ibid.* Here, MetLife denied Elliott's benefits based on evidence that simply is not analyzed in relation to her ability to perform her occupation. Although we continue to believe that plans generally are not obligated to order additional medical tests, in cases such as this, plans can assist themselves, claimants, and the courts by helping to produce evidence sufficient to support reasoned, principled benefits determinations. *Cf. Glenn*, 461 F.3d at 666.

We also note that MetLife may have been operating under a conflict of interest in this matter. The Supreme Court has recognized that an apparent conflict of interest exists when an ERISA plan both decides eligibility for benefits and pays those benefits. *See Firestone*, 489 U.S. at 115. In *Glenn*, we observed that "MetLife is authorized both to decide whether an employee is eligible for benefits and to pay those benefits. This dual function creates an apparent conflict of interest." 461 F.3d at 666 (citations omitted). MetLife is under the same apparent conflict of interest here as it was

---

[6]Of course, as a general matter, we will not overturn a plan administrator's denial of benefits for choosing to rely on the opinion of one physician over that of another. *McDonald*, 347 F.3d at 169. However, that rule is not absolute, particularly where, as here, there is so little evidence of a process that reasons from the patient's condition to her work ability. *Ibid. See also Glenn*, 461 F.3d at 666-72.

in *Glenn*. Such a conflict, if shown to have impacted MetLife's determination, would lend greater weight to the conclusion that MetLife's determination was arbitrary and capricious.

We need not determine whether MetLife's self-interest played a role in its denial of Elliott's claims. Regardless of the presence or absence of a conflict, MetLife's decision cannot withstand scrutiny. We cannot uphold an ERISA plan administrator's determination if it is not the product of "a deliberate, principled reasoning process." *Glenn*, 461 F.3d at 666. MetLife's decision-making process was neither deliberate nor based on reasoning. As such, its determination in this matter was arbitrary and capricious.

IV

Now we are left to consider the remedy. In cases such as these, courts may either award benefits to the claimant or remand to the plan administrator. *See Smith*, 450 F.3d at 265 ("[W]e vacate the judgment of the district court and remand this case for entry of an order requiring CCC to conduct a full and fair review of Smith's disability claim."); *Glenn*, 461 F.3d at 675. *See also Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005) ("There is no question that this court has the power to remand to the claims administrator; it also has the power, in appropriate cases, to award benefits to the disability claimant.") (citing *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 24 (1st Cir. 2003) and *Quinn*, 161 F.3d at 477). The question we must address is which remedy–retroactive benefits or remand to the administrator–is appropriate in this case.

The First Circuit recently addressed such a question. *Buffonge*, 426 F.3d at 31-32. In that case, the court noted that some courts have adopted the "categorical rule" that a "retroactive award is usually proper when [the] claimant had benefits and lost them," while "remand is appropriate when a decision-maker fails to make adequate findings or fails to provide [] adequate reasoning." *Ibid.* (citing *Quinn*, 161 F.3d at 477). The First Circuit declined to adopt such a categorical rule, holding instead that courts "must have considerable discretion to craft a remedy after finding a mistake in the denial of benefits." *Ibid.* (citing *Cook*, 320 F.3d at 24).

In *Buffonge*, the court held that, where the "problem is with the integrity of [the plan's] decision-making process," rather than "that [a claimant] was denied benefits to which he was clearly entitled," the appropriate remedy generally is remand to the plan administrator. *Ibid.* We agree with the First Circuit. Such a course is consistent with this court's precedent and we adopt it here.[7] *See Smith*, 450 F.3d at 265 ("[W]e vacate the judgment of the district court and remand this case for entry of an order requiring CCC to conduct a full and fair review of Smith's disability claim.").

In this matter, we cannot say that Elliott is clearly entitled to benefits. Dr. Kuntz, at the time he certified that Elliott's condition met the requirements for short-term disability, indicated she could not then perform work of any kind. However, in later reviews, Dr. Kuntz did not elaborate further on why Elliott's condition precluded her from working. Also, while Dr. Schneider's earlier reviews indicated some improvement with medication, his letter of December 9, 2003, indicates that Elliott's condition would limit her ability to fulfill her job responsibilities. Just how much such limitations would affect her ability to work, however, we cannot say with any accuracy. For example, does Elliott have a sit-stand option at her job? When Dr. Schneider referred to repetitive

---

[7]This remedy obviates the need to consider Elliott's claim that the district court should have allowed further discovery. *Smith*, 450 F.3d at 265 ("On appeal, Smith argues that the district court erred when it denied additional discovery into CCC's procedure. Because we are remanding this case for a full and fair review of Smith's disability claim, it is unnecessary for us to consider this claim on appeal."). It should be noted, however, that while discovery is generally impermissible "in an ERISA action based on a review of the administrative record, an exception to that rule exists where a plaintiff seeks to pursue a decision-maker's bias." *See Calvert*, 409 F.3d at 293 (citing *Wilkins*,150 F.3d at 618).

movements, did he mean to include typing? If so, how much typing? Can Elliott dictate her reports, rather than type them? Even presuming that Dr. Schneider's letter accurately states Elliott's physical limitations, we simply cannot say whether those limitations would preclude her from working as a business quality analyst. And, as we have noted, Dr. Menotti's review offers little support either way.

Thus, we believe that a remand to the district court with instructions to remand to MetLife for a full and fair inquiry is the proper remedy here. This course is contemplated both by our precedent and by ERISA law. *Smith*, 450 F.3d at 265. *See also Black & Decker*, 538 U.S. at 825 ("ERISA and the Secretary of Labor's regulations under the Act require 'full and fair' assessment of claims.") (citing 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1). Such a remedy will allow for a proper determination of whether, in the first instance, Elliott is entitled to long-term disability benefits. We are not medical specialists and that judgment is not ours to make. However, both MetLife and the claimant would be well advised to pursue appropriate medical data relating Elliott's undeniable medical limitations to the demands of her occupation.

V

In this case, we were asked to address whether MetLife's determination to deny long-term disability benefits to Patricia Elliott was arbitrary and capricious and, if it was, what remedy to order. As a result of the foregoing, we hold that MetLife's determination was "arbitrary and capricious" for want of a deliberate, principled reasoning process. *Glenn*, 461 F.3d at 666. We also hold that the appropriate remedy is to remand to MetLife for a full and fair inquiry in accordance with this court's precedent. *Smith*, 450 F.3d at 265. Accordingly, we vacate the district court's judgment and remand the case for proceedings consistent with this opinion.