RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

T. E., individually and on behalf of C. E. a minor,

> *Plaintiff-Appellant*,

*v.*

ANTHEM BLUE CROSS AND BLUE SHIELD; STOLL
KEENON OGDEN PLLC; STOLL KEENON OGDEN PLLC
BENEFIT PLAN,

> *Defendants-Appellees*.

No. 25-5407

─────────────

Appeal from the United States District Court for the Western District of Kentucky at Louisville.
No. 3:22-cv-00202—David Jason Hale, Chief District Judge.

Argued: December 10, 2025

Decided and Filed: January 22, 2026

Before: GRIFFIN, THAPAR, and HERMANDORFER, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Brian S. King, BRIAN S. KING P.C., Salt Lake City, Utah, for Appellant. Miles R. Harrison, FROST BROWN TODD LLP, Louisville, Kentucky, for Appellee Anthem Blue Cross and Blue Shield. Donald P. Sullivan, JACKSON LEWIS, P.C., San Francisco, California, for Stoll Keenon Ogden Appellees. **ON BRIEF:** Brian S. King, BRIAN S. KING P.C., Salt Lake City, Utah, for Appellant. Miles R. Harrison, Jason P. Renzelmann, Miranda M. Ronnow, FROST BROWN TODD LLP, Louisville, Kentucky, for Appellee Anthem Blue Cross and Blue Shield.

———————————

**OPINION**

———————————

HERMANDORFER, Circuit Judge.   T.E. enrolled his son, C.E., in a long-term, residential-treatment center to address C.E.'s mental-health issues.   That enrollment followed years of failed attempts to address C.E.'s conditions through other means.   T.E. asked his insurer Anthem to help cover the costs of the treatment.   Anthem agreed and paid for the first 21 days of C.E.'s treatment without issue.   But it then reversed course and refused to pay any further, reasoning that C.E.'s treatment was no longer medically necessary.   After a series of failed internal appeals with Anthem, T.E. sued.   He alleged that Anthem's coverage denial was arbitrary and capricious under the Employee Retirement Income Security Act (ERISA) and violated the Mental Health Parity and Addiction Equity Act (Parity Act).   The district court granted summary judgment to Anthem on both claims.   We agree with T.E. that Anthem's coverage decision was arbitrary and capricious.   But T.E. has failed to identify record evidence demonstrating that Anthem's decision violated the Parity Act.   We therefore affirm in part, vacate in part, and remand the case to the district court with instructions to remand to Anthem for further assessment of T.E.'s coverage request.

I

T.E.'s son, C.E., has a long history of behavioral and mental-health issues, including ADHD, anxiety, and autism.   To treat his conditions, C.E. regularly received therapy and medication throughout his childhood.

In January 2020, when C.E. was 13, his condition worsened.   C.E. began exhibiting aggressive behavior and suicidal ideation.   To address those issues, C.E.'s parents sent him to a partial-hospitalization program.   But that treatment did not go well.   C.E. acted physically aggressive towards staff and fellow patients.   So he was stepped up to acute inpatient hospitalization for a few days.   After returning to partial hospitalization, C.E. underwent several more weeks of treatment.   Ultimately, the hospital discharged C.E. in early February 2020.

C.E.'s treatment continued after his discharge. T.E. received a recommendation that C.E. "needed intensive in-patient treatment to address his symptoms." Axelrod & Johnson Letter, R.63-1, PageID 966. T.E. therefore enrolled C.E. at Elevations, a residential-treatment center that provides long-term treatment for adolescents with mental-health and behavioral issues. Elevations admitted C.E. on February 19, 2020.

T.E. sought health-insurance coverage for C.E.'s treatment at Elevations. Anthem is the administrator of the governing health plan. The Plan covers treatment that is medically necessary, defined here in relevant part by "coverage guidelines." Plan, R.63, PageID 384.

Here, the parties agree that the analysis turns on the MCG Guideline for Residential Behavioral Health Level of Care, Child or Adolescent. In broad strokes, the Guideline authorizes admission to residential treatment if other levels of treatment are inappropriate and (1) a patient poses a danger to himself or others or (2) suffers from a moderately severe psychiatric disorder that causes serious dysfunction in daily living. Once admitted, continued treatment is "necessary" until the patient's risk status and functional status are acceptable, his treatment goals are met, and his medical needs are manageable at a lower level of care. MCG Guideline, R.63-4, PageID 2804-05.

On February 21, 2020, Anthem approved coverage for a two-week stay at Elevations. Citing the MCG Guideline, a case manager determined that treatment at Elevations was medically necessary to address C.E.'s "mood disorder symptoms." Anthem Records, R.63-3, PageID 2021. That approval came even though the case manager noted that C.E. denied suicidal and homicidal ideation and hadn't self-harmed in years.

On March 4, 2020, Anthem approved another week of treatment at Elevations. The same case manager stated that continued treatment was necessary because C.E. had "severe executive functioning" issues, "struggle[d] to self-regulate," and could not communicate his feelings and needs appropriately. Anthem Records, R.63-3, PageID 2020. She noted that C.E. was struggling with self-care and was confined to his dorm due to his behavioral issues, among other problems.

The case manager's review a week later was much the same. She noted that C.E was again confined to his dorm for safety reasons and would not follow staff instructions. C.E. also continued to be disruptive and argumentative, on top of reporting continued anger and feelings of aggression towards others.

Despite that, the case manager stated—without explanation—that she could "not authorize additional" treatment days despite Elevations' request that C.E.'s stay continue. *Id.* at PageID 2019. Instead, Anthem directed one of its physicians, Dr. Snehal Shah, to review C.E.'s case.

Dr. Shah performed that review on March 13, 2020. It does not appear that Dr. Shah had access to C.E.'s medical records or otherwise spoke to any providers at Elevations. Instead, Dr. Shah cited the case manager's notes and issued a one-page report denying coverage. The report began by incorrectly describing C.E. as a "female." *Id.* at PageID 2017. Dr. Shah next quoted portions of the case manager's intake notes. He then asserted that the "latest clinical does not meet all the required elements of the Severity of Illness and/or Continuity of Stay Criteria items," which meant he was "not able to authorize" further treatment. *Id.* No additional analysis of C.E.'s medical background was provided.

That same day, Anthem sent a letter to T.E. informing him of its decision to deny coverage. The letter explained that "residential treatment" was "medically necessary" in two situations: (1) "for those who are a danger to themselves or others" and (2) "for those who have a mental health condition that is causing serious problems with functioning," such as "impulsive or abusive" behaviors and being "unable to perform usual obligations." Initial Denial Letter, R.63, PageID 526. And Anthem reasoned that C.E.'s continued treatment at Elevations was not medically necessary because "your condition remains improved, you remain safe, you remian [sic] medically stable, you have support, family session has been completed, and it does not show you are a danger to yourself or others." *Id.* Anthem provided no other rationale for its decision.

T.E. internally appealed Anthem's denial of coverage. T.E. maintained that C.E.'s continued treatment at Elevations was medically necessary because outpatient treatment could

not adequately address C.E.'s mental-health and behavioral issues.  In the interim, he elected to keep C.E. enrolled at Elevations and pay out of pocket for continued care.

In support of his appeal, T.E. highlighted excerpts from C.E.'s medical records at Elevations.  Those excerpts showed that C.E. was abusive and disruptive towards fellow patients and staff, struggled with completing routine daily behaviors, and began self-harming, including by banging his head against walls when agitated.  T.E. attached C.E.'s complete medical records as an exhibit.

T.E. also submitted three opinions from C.E.'s treating clinicians.  Dr. Elizabeth Manley, who evaluated C.E. at Elevations, stated that C.E. should complete his treatment there.  Jill Engle, a psychologist who treated C.E. at the inpatient hospital, remarked that C.E. needed continued treatment at Elevations to address his "impulse control, explosive or dangerous outbursts" until his "maladaptive/dangerous behaviors" are "extinguished or replaced by more adaptive behaviors."  Engle Letter, R.63-1, PageID 968.  Engle pointed out that, until his longer-term stay at Elevations, C.E. had previously experienced "short-term 'successes'" from treatment "only to fail again with a major blowup or dangerous outburst."  *Id.*  Dr. Judith Axelrod and psychological associate Todd Johnson, who treated C.E. for several years until his hospitalization, remarked that C.E.'s "behavior and emotional dysregulation was difficult to treat" and he "continued to struggle" in outpatient treatment.  Axelrod & Johnson Letter, R.63-1, PageID 965-66.

Anthem referred T.E.'s appeal to Dr. Kayla Fisher for review.  Dr. Fisher "reviewed" "1131" pages of records and drafted a short report.  Anthem Records, R.63-3, PageID 2015.  Her report begins by quoting Dr. Shah's previous report in full.  It then notes that C.E. "denied" suicidal and homicidal ideation.  *Id.*  Next, Dr. Fisher referenced Dr. Manley's conclusion that C.E. "would benefit from a small specialized classroom."  *Id.*  She then cited "Milieu notes" from C.E.'s time at Elevations, which in her view suggested that C.E. "does well on 1:1 walks with staff as these help him feel important."  *Id.*  Based on that evidence, Dr. Fisher concluded that C.E. "did not meet criteria for MCG guideline."  *Id.*

Several weeks after Dr. Fisher's review, Anthem informed T.E. that it was upholding its coverage denial. Anthem acknowledged receiving "new information from the medical record plus letters." First-Level Denial Letter, R.63-3, PageID 1706. Despite that "new information," Anthem believed its initial decision was "correct" because "after the treatment [C.E.] had, [C.E.] w[as] no longer at risk for serious harm that needed 24 hour care." *Id.* According to Anthem, it "based" that decision on the MCG Guideline. *Id.*

T.E. appealed a second time. He again explained, in detail, why C.E.'s treatment at Elevations was medically necessary and attached C.E.'s medical records in support. And he maintained that Anthem's cursory explanation in prior letters made it "impossible" to "effectively advocate on [C.E.'s] behalf." Second-Level Appeal, R.63-4, PageID 2074.

Anthem submitted T.E.'s second appeal to Dr. Robert Klaehn for review. Documentation shows that Dr. Klaehn, over a brief period, "reviewed" "662 pages of records" and concluded that those records "do not show the needed acuity for continued" treatment. Anthem Records, R.63-3, PageID 2012. He provided no explanation for that conclusion.

A week later, Anthem informed T.E. that it was again upholding its coverage denial. It provided the same explanation for its decision as in the previous letter: "[A]fter the treatment [C.E.] had, [C.E.] w[as] no longer at risk for serious harm that needed 24 hour care." Second-Level Denial Letter, R.63-4, PageID 2736.

T.E. then sued Anthem in federal court.[1] T.E. alleged that Anthem's denial of coverage was arbitrary and capricious under ERISA and violated the Parity Act. The district court granted summary judgment on both claims to Anthem, and T.E. timely appealed.

II

T.E. challenges the district court's grant of summary judgment to Anthem on two grounds. First, he maintains that Anthem's denial of coverage was arbitrary and capricious

---

[1]T.E. also named Stoll Keenon Ogden PLLC and the Stoll Keenon Odgen PLLC, Benefit Plan as defendants. Both joined Anthem's briefing in the district court and on appeal. For ease of reference, we refer only to Anthem.

under ERISA.  Second, he contends that Anthem violated the Parity Act.  We agree with T.E.'s first argument, but not the second.

A

ERISA regulates plan administrators' coverage-related decisonmaking and provides a right of action for those seeking to challenge coverage denials.  *See, e.g.*, 29 U.S.C. § 1001 *et seq*.  T.E.'s first argument is that Anthem violated ERISA because its coverage decision was arbitrary and capricious.  The arbitrary-and-capricious standard applies, all agree, because Anthem has discretionary authority to interpret the Plan.  *See Autran v. Proctor & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 411 (6th Cir. 2022).  We in turn review de novo the district court's holding that Anthem did not act in an arbitrary-and-capricious manner.  *Id.*

ERISA's arbitrary-and-capricious standard has both a procedural and substantive component.  *See Goodwin v. Unum Life Ins. Co. of Am.*, 137 F.4th 582, 589 (6th Cir. 2025).  Procedurally, we ask whether the plan administrator "engaged in reasoned decisonmaking." *Id.* (citation omitted).  We've used several factors when making that inquiry, including, as relevant here, whether: "(1) the administrator considered all relevant evidence; (2) the administrator adequately explained any change from an earlier benefits ruling;" and "(3) the administrator prized the opinions of file reviewers over those who assessed the patient in-person." *Id.*  None of those "factors is dispositive in its own right." *Id.* (citation omitted).  Instead, we "weigh them all" to determine whether the administrator's decision was procedurally deficient. *Id.* (citation omitted).  Substantively, we ask whether the administrator's coverage decision is "supported by substantial evidence in the administrative record." *Id.* at 592 (citation omitted).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Davis v. Hartford Life & Accident Ins. Co.*, 980 F.3d 541, 549 (6th Cir. 2020) (citation omitted).

Here, Anthem's coverage decision was procedurally arbitrary and capricious. Because that flaw alone entitles T.E. to his requested relief, we need not consider whether Anthem's decision also had substantive shortcomings.

1

Before turning to the merits of T.E.'s arbitrary-and-capricious challenge, we first address the scope of our review. T.E. contends that we should limit our review to the letters he received from Anthem that explain its coverage decision. Anthem, by contrast, contends that we should also consider the internal notes of its case manager and the reports prepared by its physician reviewers (Dr. Shah, Dr. Fisher, and Dr. Klaehn). Anthem does not dispute T.E.'s assertion that it did not disclose those materials to T.E. until it filed the administrative record as part of the district court litigation.

ERISA requires plan administrators to provide plan participants with "adequate notice" of a denial of coverage, including the "specific reasons for such denial." 29 U.S.C. § 1133(1). Citing that language and related regulations, some circuits have limited arbitrary-and-capricious review to the explanations disclosed in administrators' denial letters. *See, e.g.*, *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1239-43 (10th Cir. 2023); *Glista v. Unum Life Ins. Co. of Am.*, 378 F.3d 113, 130 (1st Cir. 2004). Here, however, we need not resolve the scope-of-review question. Even when considering Anthem's internal notes and reports, its coverage decision is arbitrary and capricious.

2

Turning to the merits, Anthem failed to "engage in reasoned decisionmaking." *Autran*, 27 F.4th at 412. First, Anthem did not consider "all relevant evidence." *See Goodwin*, 137 F.4th at 589. It instead ignored the opinions of C.E.'s treating clinicians. Second, Anthem selectively reviewed the remainder of the medical-record evidence. Third, Anthem did not "adequately explain[]" its coverage decision nor its "change from an earlier benefits ruling." *Id.* The scant explanation Anthem did offer disregards the MCG Guideline, the medical evidence, and its prior assessment of C.E.'s need for treatment at Elevations. Together, those shortcomings render Anthem's decision procedurally arbitrary and capricious.

a

At the outset, Anthem inadequately assessed C.E.'s treating-clinician evidence. Plan administrators "may not reject summarily the opinions of a treating physician." *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006). Instead, they must "give reasons" for deviating from treating physicians' recommendations. *Id.* Thus, "picking out the opinions of the doctors that support" the administrator's decision "while ignoring the opinions of a participant's treating doctors" is impermissible. *Autran*, 27 F.4th at 415. Applying those principles, our Court has repeatedly held that one indicator of an arbitrary-and-capricious decision is the administrator's utter failure to address the opinions of the participant's treating clinicians.[2] That is particularly so when a plan administrator's "credited doctors undertake a mere 'file' review." *Autran*, 27 F.4th at 412.

Here, T.E. submitted three opinions from C.E.'s treating clinicians to support his assertion that continued treatment at Elevations was medically necessary. Those opinions (from Dr. Jill Manley, psychologist Jill Engle, Dr. Judith Axelrod, and psychological associate Todd Johnson) recommended that C.E. continue treatment at Elevations.

In adopting the opinions of its in-house file reviewers, Anthem never addressed the opinions of C.E.'s treating clinicians. It did not "provide a reason for rejecting" those opinions in its denial letters. *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006). Anthem's physician reviewers likewise "never explained" their "disagreement with the opinions of" C.E.'s "treating" clinicians. *Butler v. United Healthcare of Tenn., Inc.*, 764 F.3d 563, 568 (6th Cir. 2014). Anthem instead decided, without explanation, to adopt the contrary opinions of its physician reviewers. And those opinions were based only on cursory "[f]ile reviews"—rendering Anthem's decision even more "questionable," particularly given that T.E.'s claim "involves a mental illness component." *Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 610 (6th

---

[2]*See, e.g.*, *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (faulting administrator where its "physician advisors simply ignored" the "conclusions" of participant's treating physician); *Elliot*, 473 F.3d at 620 (same where administrator "failed to offer any reason for rejecting" the opinions of participant's treating physician); *Glenn v. MetLife*, 461 F.3d 660, 671 (6th Cir. 2006) (same where administrator "did not indicate that it had considered" opinion of treating physician).

Cir. 2016) (citation omitted).  Anthem's total failure to address the opinions of C.E.'s treating clinicians falls short of the meaningful review ERISA requires.

Anthem offers several counterarguments in defense of its treatment of C.E.'s clinician evidence.  None persuades.

*First*, Anthem claims that it did not "totally ignore" the opinions of C.E.'s treating clinicians because it "expressly cited them."  Anthem Br. 24 (citation omitted).  It emphasizes that one of its reviewers, Dr. Fisher, referenced other aspects of Dr. Manley's treatment recommendations.  But Anthem's proposed rule misstates our caselaw.  An administrator must address the relevant aspects of a treating doctor's opinion head on, not merely cite other, collateral portions of that opinion.  *See, e.g.*, *DeLisle v. Sun Life Assurance Co. of Can.*, 558 F.3d 440, 447 (6th Cir. 2009).  Dr. Fisher did not address the crux of C.E.'s treating-clinician evidence—her report, for instance, did not mention Dr. Manley's recommendation that C.E. continue treatment at Elevations.  Nor did anyone else affiliated with Anthem.  Beyond that, Anthem's argument fails even accepting its proposed rule.  Anthem never cited the other two opinions—of Engle and Dr. Axelrod and Johnson—at all.

*Second*, Anthem contends that an administrator ignores evidence only when it makes a statement that "contradicts evidence in the record."  Anthem Br. 24.  Here too, Anthem misapprehends our caselaw.  An administrator can impermissibly ignore evidence even without committing misrepresentations or mistakes.  *Cf. Elliot*, 473 F.3d at 618-20; *Kalish v. Liberty Mutual/Liberty Life Assurance Co. of Bos.*, 419 F.3d 501, 509-11 (6th Cir. 2005).

Regardless, Anthem's reviewers did contradict evidence in the record.  Take Dr. Fisher's report, which stated that "[m]ilieu notes from 3/12-3/18/2020 note that Member does well on 1:1 walks with staff as these help him feel important."  Anthem Records, R.63-3, PageID 2015.  That is incorrect.  The milieu note actually reports that C.E. is "struggling with the program, peers, and staff," exhibited an "irritable/angry and [w]ithdrawn" mood, and had "disruptive" participation levels in the program.  Elevations Records, R.63-2, PageID 1463.  Although the note went on to suggest that C.E. "*would probably* do well with some one on one walks with

staff," as those might "*[h]elp him to* feel important," it posited that such interventions would "be slow and steady but in the long run might work." *Id.* (emphasis added).

Anthem also "ignored" other "key pieces of evidence" that cut against its decision. *Butler*, 764 F.3d at 568. T.E. quoted extensively from C.E.'s medical records at Elevations to show that continued treatment was medically necessary. Those records, along with the medical opinions, were the main thrust of T.E.'s appeal. And they indicate that C.E. was struggling with Elevation's programming and his schoolwork, was disruptive and abusive towards staff and other patients, and was engaging in self-harm—like banging his head against the wall. Those behaviors are directly relevant to the MCG Guideline, which measures medical necessity in part by reference to a patient's risk and dysfunction in daily living. By "ignor[ing]" several "key pieces of evidence" T.E. offered and making "factually incorrect assertions," Anthem can hardly be said to have afforded T.E. a full and fair review. *Id.*

*Third*, Anthem asserts that its physician reviewers considered "all the information" that T.E. submitted, including the opinions of C.E.'s clinicians. Anthem Br. 26. That is both mistaken and insufficient to salvage Anthem's decision. It is mistaken because statements from two of Anthem's reviewers—Dr. Shah and Dr. Klaehn—indicate that those reviewers considered only a limited subset of the medical evidence. It is insufficient because our caselaw requires an administrator to do more than simply review the medical opinions of a participant's treating doctors. The administrator must "give reasons for adopting an alternative opinion." *Elliot*, 473 F.3d at 620. And an administrator's "conclusory" assertion that it considered the "medical documentation on file" does not satisfy its duty to provide an "explanation of its reasons for rejecting" the medical opinions of a participant's doctor. *Helfman v. G.E. Grp. Life Assurance Co.*, 573 F.3d 383, 394 (6th Cir. 2009).

*Fourth*, Anthem contends that it is "free to find the opinions of certain doctors more persuasive," and that "rely[ing] on the opinions of some doctors over others does not increase" its "burden of explanation." Anthem Br. 23 (citation omitted). But separate from Anthem's ultimate preference for particular opinions, it must satisfy the bare minimum required by our caselaw: "give" some "reasons" for rejecting the opinions of the participant's treating doctors. *Elliot*, 473 F.3d at 620. Anthem failed to do so.

All told, Anthem shut its eyes to the medical opinions of C.E.'s treating clinicians, which suggests that its coverage denial was arbitrary and capricious. *See Glenn*, 461 F.3d at 671.

b

Next, Anthem selectively cited portions of C.E.'s medical records to support its coverage denial while ignoring countervailing evidence in those same records. Such evidentiary "cherry-picking" is a hallmark of arbitrary-and-capricious decisionmaking. *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 266 (6th Cir. 2007). So is an administrator's choice to "arbitrarily refuse to credit a claimant's reliable evidence." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Anthem's selective review is readily apparent. Dr. Shah's report, for example, quoted a portion of the case manager's initial intake note reporting that C.E.'s behavior and mood were "cooperative." Anthem Records, R.63-3, PageID 2017. But later notes, in describing C.E.'s response to treatment, indicate that he: (1) was "struggling with following rules"; (2) "argues with peers" and was "verbally aggressive towards peers"; (3) "did not follow staff directives"; (4) "blatantly ignores staff prompts"; (5) "interrupted the therapist with [c]rude humor"; (6) is "having consistent peer conflict"; and (7) "won't talk to staff." *Id.* at PageID 2019-20. Dr. Shah never explained why he privileged one portion of the notes over the other or how he reconciled the conflicting evidence.

Dr. Fisher's treatment of Dr. Manley's report provides another example. To support her conclusion that continued treatment at Elevations was not medically necessary, Dr. Fisher cited a paragraph from Dr. Manley's report stating that C.E. needed a "small specialized classroom." *Id.* at PageID 2015. But Dr. Fisher never addressed Dr. Manley's conclusion in the very same paragraph that C.E. should continue treatment at Elevations to develop coping skills for his behavioral and mental-health issues.

As before, Anthem's counterarguments boil down to assertions that it did in fact review the entire record and that an administrator only selectively reviews the record when it makes affirmative misstatements. That position fails for the reasons discussed above. Anthem's

selective review thus provides another indication that its decision was procedurally arbitrary and capricious.

c

Finally, Anthem failed to "adequately explain[] any change from an earlier benefits ruling." *Goodwin*, 137 F.4th at 589. Recall that Anthem initially covered 21 days of treatment at Elevations. It then denied further coverage.

To justify that change in view, Anthem needed to "identify a rational reason for changing its benefits answer from 'yes' to 'no.'" *Id.* at 590 (citation omitted). Yet the explanation Anthem provided is divorced from its initial coverage decision, the MCG Guideline, and the record evidence. Anthem's "haphazard[]" about-face flouts ERISA's requirement of reasoned explanation. *Autran*, 27 F.4th at 414.

*Appeal denials.* Anthem's letters denying C.E.'s appeals do not contain adequate reasoning. Both letters recited the same justification: "[A]fter the treatment you had, you were no longer at risk for serious harm that needed 24 hour care." First-Level Denial Letter, R.63-3, PageID 1706; Second-Level Denial Letter, R.63-4, PageID 2736. There are two problems with that statement.

*First*, C.E. was not admitted to Elevations because of his risk for serious harm. In rendering the initial coverage decision, Anthem's case manager noted that C.E. did not have suicidal or homicidal ideations. Its physician reviewers reiterated that fact in their subsequent reports. Anthem actually approved C.E.'s treatment at Elevations to address his "mood disorder" and "executive functioning issues." Anthem Records, R.63-3, PageID 2020-21. That approval was consistent with the MCG Guideline, which provides that treatment is medically necessary to address a "moderately severe [p]sychiatric" disorder that causes "[s]erious dysfunction in daily living," even if the patient does not pose a "danger" to "self" or "others." MCG Guideline, R.63-4, PageID 2803. So Anthem's harm-based explanation is a non-sequitur.

*Second*, Anthem's explanation contradicts the MCG Guideline governing discharge from residential treatment. That Guideline does not hinge the necessity of continued treatment on risk

of harm standing alone. Instead, it specifies that continued treatment is "necessary" until "all" four criteria are met. *Id.* at PageID 2804-05. And risk of harm is not relevant to three of the four criteria. *Id.* Under the MCG Guideline, then, Anthem could not rest its decision to discontinue residential treatment solely on C.E.'s risk of harm.

*Initial denial letter.* Nor does Anthem's initial denial letter satisfy ERISA. That initial letter stated Anthem's view that continued treatment at Elevations was not "medically necessary" because the "information we have reports your condition remains improved, you remain safe, you remian [sic] medically stable, you have support, family session has been completed, and it does not show you are a danger to yourself or others." Initial Denial Letter, R.63, PageID 526. For several reasons, that explanation was insufficient.

Take Anthem's claim that the "information we have reports your condition remains improved." *Id.* It is unclear what "information" Anthem is referring to here. *Id.* At this point, Anthem had the case manager's intake note on February 21 and her follow-up notes on March 4 and 10. It also had Dr. Shah's report, which merely quoted the case manager's notes. None of those sources support the proposition that C.E.'s condition had improved. To the contrary, the case manager's March 4 notes indicate that C.E. was struggling with executive-functioning issues, self-regulation, and communication. Those notes also identified several other problems, including that C.E. had difficulty performing routine daily tasks. Nor does the March 10 entry evince improvement. C.E. was confined to his dorm, refused to follow staff instructions, and exhibited emotional dysregulation.

That aside, we've noted that "logically speaking, evidence of an improvement, without a starting or ending point, does not help answer the question of whether" further treatment is medically necessary. *Elliot*, 473 F.3d at 620. And the MCG Guideline, for its part, provides that residential treatment is "necessary" until "[m]edical needs" are "absent or manageable" at a lower level of care. MCG Guideline, R.63-4, PageID 2804-05. The bare assertion that C.E. had marginally "improved," without reference to any medical baseline, does not address that criterion.

Next, consider the initial denial letter's statements that C.E. "remain[s] safe" and "rem[ains] medically stable." Initial Denial Letter, R.63, PageID 526. Even if true, those statements do not support Anthem's coverage denial. Whether C.E. remained safe or stable was not the dispositive question under the MCG Guideline for discharge. Instead, Anthem needed to address whether C.E.'s "[f]unctional status" was "acceptable" and his "needs" were "manageable" at an "available lower level of care." MCG Guideline, R.63-4, PageID 2805. Here too, Anthem's explanation was absent.

Anthem's statements in the initial letter that C.E. "ha[s] support" and completed a "family session" are likewise insufficient. Initial Denial Letter, R.63, PageID 526. The MCG Guideline asks whether the "[p]atient" and his support network "understand follow-up treatment and crisis plan" and whether the "[p]rovider and supports are sufficiently available at [a] lower level of care." MCG Guideline, R.63-4, PageID 2805. Anthem's explanation does not address those criteria. Nor does C.E.'s completion of a single family-therapy session have any bearing on the medical necessity of continued residential treatment under the MCG Guideline.

That leaves Anthem's assertion that the evidence "does not show you are a danger to yourself or others." Initial Denial Letter, R.63, PageID 526. But for reasons discussed above, the MCG Guideline did not permit Anthem to deny coverage based on the risk-of-harm factor alone.

*Physician-reviewer materials.* The reports of Anthem's physician reviewers do not justify Anthem's decision either. Dr. Shah's and Dr. Klaehn's reports offered only bottom-line conclusions, devoid of any explanation. But "bare conclusions are not" an "explanation," *Love v. National City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397 (7th Cir. 2009) (cleaned up), and our caselaw requires the latter, *see Elliot*, 473 F.3d at 617. Dr. Fisher offered *some* explanation for her conclusion. But as set out above, that explanation misstated the record and never addressed why treatment was no longer needed to address C.E.'s "mood disorder" and "severe executive functioning" issues. Anthem Records, R.63-3, PageID 2020-21. So it's not an adequate explanation for Anthem's position change. *See Butler*, 764 F.3d at 569.

In sum, Anthem initially approved C.E.'s treatment to address his mood disorder and executive-functioning issues.  That approval comported with the MCG Guideline.  But Anthem then changed course.  Instead of explaining what changed, Anthem justified its coverage denial by citing considerations that were unrelated to C.E.'s initial admission and contradicted its prior assessment.  Anthem's justification for its coverage-decision change was, in short, irrational.

3

To recap, Anthem (1) ignored the opinions of C.E.'s treating clinicians; (2) selectively reviewed the record by cherry-picking portions of C.E.'s medical records that supported its decision while ignoring adverse evidence in those same records; and (3) provided a deficient explanation for denying additional coverage.  In so doing, Anthem rendered a decision that is procedurally arbitrary and capricious.  The district court thus erred in granting summary judgment to Anthem on T.E.'s denial-of-coverage claim.

T.E. asks us to remedy Anthem's arbitrary-and-capricious coverage denial by "award[ing] benefits or, at least, remand[ing] the case for further proceedings."  T.E. Br. 26-27.  We opt for the latter course.

"When a benefits plan is found to have acted arbitrarily and capriciously, we have two options: award benefits to the claimant or remand to the plan administrator."  *Shaw v. AT & T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 551 (6th Cir. 2015).  Remand is appropriate when the administrator makes a "process error," as such errors do "not necessarily show that the plan entitles the beneficiary to benefits; the error shows only that the administrator's reasoning cannot stand."  *Card v. Principal Life Ins. Co.*, 17 F.4th 620, 624-25 (6th Cir. 2021) (per curiam).  By contrast, awarding benefits is appropriate only when the participant is "clearly entitled" to them.  *Elliot*, 473 F.3d at 622.

Remand is appropriate here.  T.E. has put forth evidence that C.E.'s treatment is medically necessary under Anthem's coverage guideline.  But it is not obvious that T.E. is "clearly entitled" to coverage.  *Id.*  We "are not medical specialists," and so the medical "judgment[s]" necessary to determine whether T.E. is entitled to coverage are "not ours to make."  *Id.* at 622-23.  Moreover, the problems identified above go to Anthem's "decision-

making process." *Id.* at 622 (citation omitted).  The "proper remedy" in such a case is to vacate the district court's decision and remand with instructions that the district court remand to the plan administrator for "a full and fair inquiry." *Id.*

We therefore vacate the district court's grant of summary judgment to Anthem on the ERISA claim and remand with instructions that the district court remand to Anthem for a full and fair review of the requested coverage.

B

That leaves T.E.'s Parity Act claim.  T.E. maintains that Anthem violated the Parity Act because it mishandled C.E.'s claim for mental-health benefits, but does not mishandle claims for medical or surgical benefits.  But T.E. fails to identify record evidence supporting essential elements of that claim.  So we affirm the district court's grant of summary judgment to Anthem on the Parity Act claim.

The Parity Act requires insurers to treat mental-health benefits comparably to other benefits.  29 U.S.C. § 1185a(a)(3)(A).  As relevant here, the Act imposes two requirements on insurers that provide "both medical and surgical benefits and mental health . . . benefits."  *Id.* First, the plan must "ensure" that "the treatment limitations applicable to such mental health" benefits "are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits."  *Id.*  Second, the plan must "ensure" that there are no "separate" treatment limitations "applicable only with respect to mental health" benefits. *Id.*  Such treatment limitations include "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment."  *Id.* § 1185a(a)(3)(B)(iii).

We have neither interpreted nor applied the Parity Act.  Indeed, we have not even accepted that there is a private cause of action to enforce the Parity Act—though Anthem does not argue otherwise.  *Cf. E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1281 (10th Cir. 2023). But we need not resolve here exactly how to evaluate Parity Act claims because T.E.'s claim fails in any event.

At a minimum, the statutory text directs that Parity Act claims require a comparison between an insurer's treatment limitations for mental-health care and the treatment limitations for medical or surgical care. To establish a violation, a plaintiff must show that the "treatment limitations" on mental-health care are "more restrictive" than or "separate" from the treatment limitations on medical or surgical care. 29 U.S.C. § 1185a(a)(3)(A)(ii). Logically, that requires a plaintiff bringing an as-applied challenge—as T.E. is here—to demonstrate what those medical or surgical treatment limitations are and how they apply in practice. Without such evidence, there would be no way determine whether the treatment limitations on mental-health care are "more restrictive" or "separate" in a particular case. *Id.*

And at summary judgment, a plaintiff cannot rest on allegations. He "must" instead "identify evidence in the record to substantiate each claim in [the] complaint." *Cahoo v. SAS Inst., Inc.*, 71 F.4th 401, 406 (6th Cir. 2023). So "summary judgment should be granted" when the plaintiff produces only "bare allegations." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992).

Bare "allegations" are all T.E. offers. Reply Br. 21. On appeal, T.E. contends "that Anthem misapplied its guidelines in C.E.'s case but does not misapply medical/surgical guidelines." *Id.* But he fails to identify any record evidence of what those "medical/surgical guidelines" are or how they apply in practice. *Id.* That evidence thus appears to be missing from the record—and if it is "buried in the record," T.E. hasn't told us where to look. *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) (cleaned up).

T.E. has therefore failed to identify any record evidence of Anthem's "treatment limitations" on medical and surgical care. 29 U.S.C. § 1185a(a)(3)(A)(ii). He has also failed to identify evidence of how those limitations are "separate" from or less "restrictive" than Anthem's "treatment limitations" on mental-health care. *Id.* Thus, assuming the Parity Act even provided T.E. with a cause of action, T.E. failed to satisfy his "burden of proof" on the "essential element[s]" of his claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That means the district court properly granted summary judgment to Anthem on T.E.'s Parity Act claim.

\*        \*        \*

We affirm in part, vacate in part, and remand the case with instructions that the district court remand to Anthem.